383 F.2d 709
 Robert Elmer ROWE, Appellant,
v.
C.C. PEYTON, Superintendent of the Virginia State
Penitentiary, Appellee.
Clyde Mason THACKER, Appellant,
v.
C. C. PEYTON, Superintendent of the Virginia State
Penitentiary, Appellee.
 Nos. 11072, 11217.
 United States Court of Appeals Fourth Circuit.
 Argued June 19, 1967.
Decided Aug. 28, 1967.
 
 John J. Kirby, Jr., Charlottesville, Va. (Court-assigned counsel), for appellants.
 Reno S. Harp. III, Asst. Atty. Gen. of Virginia (Robert Y. Button, Atty. Gen., of Virginia, on brief), for appellee.
 Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN, WINTER and CRAVEN, Circuit Judges, sitting en banc.
 HAYNSWORTH, Chief Judge:
 We are asked to decide whether or not any remedy is available to state prisoners seeking to attack, on constitutional grounds, state sentences to be served in the future which have no present effect upon consideration of the prisoners for parole. We think that the traditional writ of habeas corpus is available to serve the clearly present need of a procedural device to test the legality of these convictions under the Constitution of the United States.
 * In 1963 Rowe was convicted of rape in Staunton, Virginia and a sentence of 30 years was imposed upon him. Three days later, in Waynesboro, Virginia, he was arraigned for the felonious abduction with intent to defile the same female of whose rape he had been convicted in Staunton. A plea of former jeopardy was overruled, whereupon, on advice of counsel, Rowe tendered a plea of guilty. Rowe alleged that he had been told by his lawyer that any sentence imposed upon him in Waynesboro would be required to run concurrently with the thirty year sentence imposed upon him in Staunton for the rape. However, the Court imposed upon him a sentence of 20 years to run consecutively to the sentence on the rape charge, and he was committed to the penitentiary to serve the two consecutive sentences totalling fifty years.
 Rowe will not begin to serve the sentence imposed upon him in Waynesboro for abduction until the year 1993. Because, under Virginia law, a prisoner, regardless of the length of his sentence, may be considered for parole after serving twelve years, Rowe is presently scheduled to become eligible for parole in 1975. If the second sentence is invalidated, Rowe's eligibility for parole will be advanced to late 1970 or early 1971.
 Rowe has not attacked the first conviction for rape. He has sought to attack in the state and federal courts his second conviction, the one for abduction, on grounds of former jeopardy and of involuntariness of his guilty plea which, he alleged, was induced by the misadvice given him and the indifference of his trial counsel. Virginia concedes that, on the merits, the petition states a prima facie claim of invalidity of the abduction conviction which, if substantiated at a hearing, would require that the conviction be vacated.
 II
 In 1964 Clyde Thacker was committed to the Virginia State Penitentiary to serve a number of sentences totalling sixty years, four months and sixteen days. He seeks to attack three sentences which are presently scheduled to commence in service in 1994 and to end in the year 2004. They were imposed upon him in 1953, but were suspended. The suspension was revoked in 1956.
 Because of the rule of eligibility for consideration for parole after service of twelve years, Thacker will become technically eligible for such consideration in 1976. That date will not be advanced even if the three sentences under attack are vacated.
 
 
 1
 Thacker seeks to attack these three sentences upon the ground of inadequate representation by his trial counsel at the time of his convictions in 1953. The factual allegations facially show such gross neglect by the lawyer of his client's interests that, were the alleged facts established in a hearing, Thacker would be entitled to have those sentences vacated. As in Rowe's case, the Commonwealth concedes that Thacker's petition sufficiently states a constitutional claim and cannot be dismissed without a hearing if there is any appropriate remedy.
 
 III
 
 2
 It is thus apparent that in 1971 when Rowe's conviction for abduction begins to affect his eligibility for consideration of parole, he will be permitted to attack that conviction.[1] On the basis of the allegations of his present petition he will be entitled to a hearing.
 
 
 3
 When Thacker becomes eligible for parole in 1976 he, too, will be allowed to attack his 1953 convictions for, while these convictions do not affect the parole eligibility date, their presence on his record is strongly calculated to weigh heavily against the grant of parole.[2] The question is whether, meanwhile, Rowe and Thacker must patiently wait until the challenged convictions begin to hurt them in terms of an immediate potential parole. The answer involves a more fundamental question, whether the courts are powerless to provide an effective remedy to vacate constitutionally defective convictions at a time when witnesses are available and their memories relatively fresh, when it is certain that, if the prisoner survives so long, there will be an available remedy some years hence.
 
 IV
 
 4
 At the outset it is objected that Thacker has not pursued available state remedies. It is true that he has not, but Rowe has. His petition was rejected by the Supreme Court of Appeals of Virginia without an opinion, but in light of the factual allegations of the petition, that rejection must have been upon the procedural ground that Rowe was not presently serving the sentence he seeks to attack.[3] Thacker should not be required to travel the same road through the state courts to present a question which the Virginia Supreme Court of Appeals has so recently decided, when there is no indication that it is now prepared to depart from the former course of its decisions.[4]
 
 V
 
 5
 It is further objected by the Commonwealth that the question of availability of remedies has not been presented to the Supreme Court of Appeals of Virginia in the lucid fashion in which it has been developed in this Court. This Court was concerned about the question and undertook to have it fully developed here by granting certificates of probable cause to appeal and appointing an exceptionally able lawyer who has filed a very enlightening brief. While academicians may speculate about a decision of a court in light of the quality of the advocacy as indicated by the briefs filed in the case, that is a role we should not undertake in resolving questions of exhaustion of state remedies. If the question was clearly tendered, as it was in Rowe's and other cases, and decided by the State Court, we must accept the decision as an authoritative declaration of state law even if, upon an examination of the briefs filed in the state court, we are of the opinion that they were less comprehensive and less helpful than the briefs which have been filed in this Court. Appellate courts can be greatly assisted by inspired counsel, but counsel's performance contains neither the measure nor the limit of the court's perception or analysis; Judges may know and understand many relevant things that are not intelligently discussed by lawyers in a particular case. Even when lawyers perform superbly, as they have in this case, all of the tools of decision may not be found in the briefs.
 
 VI
 
 6
 We thus reach the merits of the procedural question of present availability of a federal remedy for the adjudication of constitutional validity of these state sentences to be served in the future.
 
 
 7
 The 'Great Writ' has deep antecedents in the English common law as a procedural device for protecting and extending the jurisdiction of courts. As an effective weapon, for the protection of individual liberties from monarchial interference, it evolved in the Seventeenth Century, in the course of a great constitutional crisis.[5] As such it was imported into this country as a shield against authoritarian commitments under orders of the Crown. Available, too, for the procurement of bail for bailable offensesn,[6] and for the questioning of private restraints upon individual liberties, it was not envisioned as an instrument for questioning judicial authority except in the narrowest of jurisdictional senses. The writ was unavailable to one held for trial or convicted of a felony in a court having jurisdiction of the offense and of the person of the petitioner.[7] When no sentence of a court having jurisdiction was subject to attack on habeas corpus, there was no justiciable problem of sentences to be served in the future.
 
 
 8
 When, by the Act of February 5, 1867,[8] the federal writ was extended to persons held under state commitments in violation of the Constitution, laws or treaties of the United States, our present problem still did not arise. While the statute might have been construed more broadly, the current understanding of the limitations of the writ was so definitive that the jurisdictional concept remained in full flower. A state court's commitment was not questionable in a federal habeas corpus proceeding if the offense was triable in the state court and the prisoner subject to its power.[9] There was no substantial crack in that conceptual limitation until 1915 when, in Frank v. Mangum,[10] the Court assumed that a state court having jurisdiction might be ousted of it by the overriding influence of a mob.[11]
 
 
 9
 Even under this relaxing concept of 'jurisdiction,' which viewed some judgments as void, rather than voidable, the writ offered little encouragement to a prisoner oppressed with a sense of injustice in the imposition of a sentence to be served in the future. Nevertheless, such a case did reach the Supreme Court in 1934.[12] McNally complained of a sentence imposed upon him on the third count of a three count indictment. His contention was that the third count was so defective as to oust the court of jurisdiction to impose any sentence. He lost in the lower courts on the ground that the defect in the indictment was not so egregious as to make the sentence void, rather than voidable,[13] but the Supreme Court, bypassing that queston, held that the writ was unavailable to question a sentence to be served in the future. That holding, so crucial here, will be considered in detail hereafter.
 
 
 10
 It was not until Brown v. Allen[14] that any great vista was opened to state prisoners seeking federal habeas corpus to attack state court convictions. It was then held that the writ was available to state court prisoners complaining of denials of federal constitutional rights in their trials. That vista, however, was greatly circumscribed by the limitation that the federal claim must have been clearly raised and prosecuted through the state courts.[15] It was not until 1963 that the circumscriptions of Brown v. Allen (Daniels v. Allen) were clearly and finally abandoned in Fay v. Noia.[16]
 
 
 11
 Meanwhile, there had been a rapid expansion of the meaning of the due process and equal protection clauses of the Fourteenth Amendment. A state prisoner had no incentive to question his conviction upon grounds of absence of counsel, inadequate performance of counsel or a multitude of other grounds until decisions came down making such deprivations matters of constitutional dimension.
 
 
 12
 It is thus apparent that the present procedural problem had no immediate urgency until very recently when the extension of the writ to obtain federal adjudication of federal constitutional issues arising during the state court proceedings /17/ and the freeing of the writ's availability from technical limitations arising out of state court procedural requirements,[18] combined with the currently proceeding reinterpretation of the due process and equal protection clauses of the Fourteenth Amendment to include within their reach many things now becoming to be regarded as of fundamental fairness.[19] A few years ago, the question whether habeas corpus was available to attack a sentence to be served in the future was of little more than academic interest; today it has become a question of pressing importance to vast numbers of prisoners with colorable claims upon which to found attacks upon successive and subsequent sentences.
 
 
 13
 The problem we face simply did not exist in the Seventeenth Century. Now that recently it has arisen, if there is a substantive right crying for a remedy, it seems most inappropriate to approach a solution in terms of a Seventeenth Century technical conception which had no relation to the context in which today's problem arises.
 
 
 14
 As we have noted, the Supreme Court dealt with tis problem in 1934, before it became acute, in McNally v. Hill,[20] and it then supplied the doctrinaire answer. McNally was serving the second of three consecutive sentences when he sought habeas corpus to attack the third. He had served enough of the second sentence to be eligible for consideration for parole if the third sentence were invalid, but, since he was being held under the concededly valid second sentence and his immediate release could not be ordered by the court, the Supreme Court held that habeas corpus was unavailable to him. The prisoner's only purpose in seeking habeas corpus was to establish his eligibility for parole, and the Supreme Court thought that might be done by a petition for mandamus to require the Parole Board to entertain a petition for parole. The Supreme Court thought McNally should have an available remedy, but held habeas corpus the wrong route.
 
 
 15
 Since McNally v. Hill the Supreme Court has not dealt directly with the problem,[21] but it has embraced a more liberal, less technical concept of the writ. This is exemplified in such cases as Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), and Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The new approach is thoroughly inconsistent with the narrowly technical one of McNally. The change seemed so apparent to us that, in Martin v. Commonwealth of Virginia,[22] when we were faced with the precise McNally v. Hill issue, we concluded that the Supreme Court today would not follow it when the conviction under attack had a present adverse effect upon the prisoner's eligibility for parole. This Court, of course, must follow the Supreme Court, but there are occasional situations in which subsequent Supreme Court opinions have so eroded an older case, without explicitly overruling it, as to warrant a subordinate court in pursuing what it conceives to be a clearly defined new lead from the Supreme Court to a conclusion inconsistent with an older Supreme Court case. That we did in Martin, and we took the matter one further step in Williams v. Peyton,[23] in permitting a prisoner to attack a future sentence, though he was already eligible for parole, since the fact of the future sentence to be served was strongly calculated to influence the Parole Board's action. In each of these cases we departed from the strict holding in McNally. We considered it no longer controlling authority, and we will adhere to that view until the Supreme Court has an opportunity to declare what, if any, vitality that case presently retains. Certainly, McNally's doctrinaire approach and its dealing with the problem in terms of the old jurisdictional concept have been thoroughly rejected by the Supreme Court in recent cases.
 
 
 16
 Here, we are asked by the prisoners, of course, to go beyond the strict limits of our holdings in Martin and Williams, for the future sentences under attack here have no present effect upon their being considered for parole. While Martin and Williams represent a significant departure from the historic conception that the writ of habeas corpus was available only if the court's order would procure the immediate release of the prisoner, they were founded upon the notion that the future sentence under attack had an immediate inhibiting effect upon the petitioner's chances of obtaining conditional release on parole. To the extent that the future sentences had such an effect in Martin and in Williams, their vacation would procure the prisoner's immediate release from them. The further step we are asked to take in this case cannot be founded upon precisely the same rationale, but we have concluded that taking it is both logical and necessary.
 
 
 17
 Virginia's Attorney General seems to recognize in this case the desirability of some present remedy by which the constitutionality of these future sentences may be determined. It is certain that each of these prisoners will suffer decided detriment from them in the future, unless death in the interim relieves him of all of his burdens. If he is compelled to wait the many years until he commences service of them, or even for those several years until the future sentence has an adverse impact upon his being considered for parole, all responsible officials who participated in the trial, judge, prosecutor, lawyer, clerk and reporter, may have died, or the case have become so dim in their memories that they could contribute nothing as witnesses. If there is not now a transcript of stenographic notes of the proceedings, there is great likelihood that it would be unavailable many years hence, and unless there is a present remedy by which the substantive questions can be raised, no court has authority to require production of a transcript of such proceedings.
 
 
 18
 Enforced delay from lack of a remedy over a period of many years is, itself, a decided detriment to the prisoner. He may lose the only means by which he may substantiate his claim. It is an even greater potential detriment to Virginia. Years hence, the prisoner, at least, may be expected to give testimonial support to the allegations of his petition, but if they are false in fact, the Commonwealth of Virginia may be unable to refute them because of the unavailability of records and of the testimony of responsible officials and participants in the trial. The greater the lapse of time, the more unlikely it becomes that the state could reprosecute if retrials are held to be necessary. It is to the great interest of the Commonwealth and to the prisoner to have these matters determined as soon as possible when there is the greatest likelihood the truth of the matter may be established. Justice delayed for want of a procedural, remedial device over a period of many years is, indeed, justice denied to the prisoner and, in an even larger degree, to Virginia.[24]
 
 
 19
 While agreeing that provision of a present remedy would be a desirable reform, however, the Commonwealth sugests that it is a legislative matter. With this, we must disagree.
 
 
 20
 The writ of habeas corpus is not the creature of a legislature. It was a device fashioned by the common law courts to protect and extend their own jurisdiction.
 
 
 21
 In the Seventeenth Century it developed into the 'Great Writ' so prized in Colonial America. In the process, it was assisted by the Petition of Right, enacted by the Parliament in 1728 to extend the writ to bring into question commitments under orders of the Crown,[25] and it received procedural assistance in its codification in the Habeas corpus Act of 1679,[26] But the writ was essentially the product of judicial innovation.
 
 
 22
 In this country, in Article I Section 9 of the Constitution, it was provided that the privilege of the writ shall not be suspended except when required by the public safety in times of rebellion or invasion. The Judiciary Act of 1789[27] authorized the federal courts to grant such writs, but the nature and scope of the writ was to be found neither in Article I of the Constitution nor in the Judiciary Act of 1789.
 
 
 23
 Until 1867 the writ was available in a federal court only to question federal detention. Occasions for its use were infrequent, and in most instances it was employed to question detention of individuals by the military authority acting under executive orders.[28]
 
 
 24
 By the Act of February 5, 1867[29] the federal writ was extended to procure the release of persons held in state custody in violation of the Constitution, laws or treaties of the United States. That statutory authorization, now embodied in 28 U.S.C.A. 2241, was, unquestionably, a congressional extension of the federal writ to reach cases of state custody, but it was not immediately recognized as having expanded the scope of the writ or altered its other procedural requirements.
 
 
 25
 Thus, it was held in Ex parte Parks,[30] just as it had been held earlier in Ex parte Watkins,[31] that a prisoner serving a sentence imposed by a court of competent jurisdiction had no reocurse to habeas corpus. Ex parte Parks was concerned with a federal prisoner, but the scope of the writ was the same whether the petitioner was a state or a federal prisoner. This is clear from the statute.[32]
 
 
 26
 In the remainder of the Nineteenth Century there was little advance from that level, except that certain major defects were treated as jurisdictional.[33]
 
 
 27
 The great flowering of the writ was a mid-Twentieth Century phenomenon starting tentatively with Frank v. Mangum budding in Brown v. Allen and blossoming with Fay v. Noia. Those tremendous developments of the writ were entirely judicial, not legislative, and if they owe some debt to a permissive construction of the Act of 1867, it was a construction discoverable only by Twentieth Century judges.[34]
 
 
 28
 When the writ as it is known today, therefore, is almost entirely the product of judicial innovation and adaptation to fit it to new situations and newly felt needs, judges should not hesitate to take a further step to adapt it to meet yet another need which is present, urgent, and recognized, even by the state.
 
 
 29
 We need not speculate about the matter, however; the Supreme Court has declared that habeas corpus 'is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose'[35] The statement is historically accurate, and it epitomizes the governing principle of our decision.
 
 
 30
 The law today abhors a right without a remedy just as the common law did. The genius of the common law was the improvisation of remedies to obtain adjudication of substantive rights. The generative capacity did not end with the first or second generation. It is vigorously present today. If common law pleading became overly technical and debate tended to veer toward appropriateness of the writ the suitor had invoked, we, in this day of simplified pleading, should not lose sight of our judicial heritage of a continuing evolution of remedial processes to right asserted wrongs. If, despite the general abandonment of the technically difficult common law pleading in favor of a system in which the court supplies the appropriate remedy for the right asserted, we would be untrue to our judicial inheritance if we dealt ungenerously with rights still affected by the vestiges of technical limitations applied in an earlier era to common law pleadings. Our recitation of its history discloses that the writ of habeas corpus has not been a static thing. There is nothing in that history to suggest that it should be restricted to the need of a much earlier time.
 
 
 31
 Taking our direction from Jones v. Cunningham's declaration of the potentiality for growth of the writ of habeas corpus to achieve its purpose, and from Fay v. Noia's assurance of 'the fullest opportunity for plenary federal judicial review'[36] and the necessity for 'swift and imperative justice on habeas corpus,'[37] we conclude that we are not bound in the circumstances of these cases by the historic requirement for availability of the writ that the court's order may procure the immediate release of the prisoner.[38] Nor does that historic requirement limit us to the Martin and Williams situations in which the sentence under attack prevents the prisoner's being considered for parole or has an inhibiting effect upon the granting of parole. So far as the historic limitation is concerned, we conclude that the writ is available to attack any sentence, service of which will be required in the future by the same custodian who presently detains the prisoner.
 
 
 32
 This is not the end of our inquiry, however, for the statute provides that '(c) The writ of habeas corpus shall not extend to a prisoner unless--* * * (3) He is in custody in violation of the Constitution or laws or treaties of the United States * * *.'[39] The statute says nothing about the court's order being able to procure a prisoner's immediate release, and the statutory requirement of custody is subjuct to reasonable interpretation consistent with the general purpose of the writ and its development in more recent cases in the Supreme Court.
 
 
 33
 In a technical sense, each of the prisoners here is presently serving only one of the sentences imposed to run consecutively, but in a substantive and practical sense Rowe is serving a total commitment of 50 years and Thacker one of more than 64. For purposes of determining parole eligibility, Virginia treats the aggregate time imposed by consecutive sentences as 'the term of imprisonment.'[40] To the prisoner, members of his family, and fellow prisoners it matters little how the order of sentence service is listed by the clerk in the superintendent's office. The one significant, substantive thing is the aggregate length of his successive sentences to be served, for they govern entirely his hope for ultimate release whether by parole or by complete sentence service.
 
 
 34
 The administrative computation of the sequence of sentence service is a flimsy basis to determine to right of access to the courts for a determination of substantial constitutional claims. Virginia might, if it wished, have them served in inverse order, and an interruption in service does result in substantial changes in the order of service. In one of the cases here, Thacker seeks to attack convictions imposed upon him in 1953, but he is administratively said to be serving a sentence imposed upon him much later.[41] For a number of reasons, there must be an administrative determination of the sequence of sentence service, but however it is done, it is an arbitrary, mechanical thing subject to subsequent variation and adjustment. When the one important, substantive fact is the aggregate of all of the successive sentences a prisoner is required to serve, his right of access to the courts should not be conditioned upon the sequence in which the state chooses to list consecutive or successive sentences for service.
 
 
 35
 It is only in a highly technical sense, therefore, that each of these prisoners may be said not to be serving the sentence he seeks to attack. In a substantive sense, each is serving each of the sentences for the service of which he was committed, regardless of the sequence in which Virginia has listed them for service.
 
 
 36
 The custody requirement of the statute has not been applied in this country in a mechanical and restricted way. In Jones v. Cunningham,[42] a parolee was held in sufficient custody to meet the requirements of the writ. We, in Thomas v. Cunningham,[43] recognized the predominating, substantive fact that a prisoner is in custody for the service of future sentences as well as the one he is administratively considered to be serving. Of the Six consecutive two year sentences imposed upon Thomas, we said: 'Furthermore, every preceding term was a factor in the detention under every succeeding one, because Thomas was held not only for service of the current term but as well to satisfy the subsequent terms.'[44] We have also felt ourselves so unrestricted by administrative determination of sentence service as to permit a prisoner to attack a sentence which, according to the administrative record, had been fully served but the removal of which from the record, with advancement of the commencement of service of the valid terminal sentence to the time of ocmmitment, would result in his immediate release.[45] The fact that Virginia attributed his earlier years of service to invalid sentences and his current service to a concededly valid sentence did not prevent our going to the substance of the matter.
 
 
 37
 We come to a similar conclusion here. Virginia is holding both of these prisoners not only for service of the sentence which administratively each is said to be currently serving, but for service of the subsequent ones as well. Each of them is in custody within the meaning of the statute under each of the consecutive sentences for the service of which he was committed, and he is presently entitled to test the constitutionality of any such sentence.
 
 
 38
 While, as we observed earlier, the rationale of Martin and Williams does not dictate our conclusion here, for neither of these prisoners, in any event, will be eligible for parole, that circumstance is not crucial to the conclusion that Virginia is holding these prisoners for service of the aggregate terms of all sentences under which they have been committed. A substantive view of the matter and the relevant precedents of more recent years lead us here to the same result we reached in Martin and Williams.
 
 
 39
 Ours is a reasonable interpretation of the custodial requirement of the statute.[46] It is made particularly appropriate by the necessity of a present remedy to avoid unconscionable and injudicious delay of many years in the adjudication of justiciable claims of constitutional dimensions.
 
 VII
 
 40
 Having reached the conclusion that habeas corpus is available to these prisoners, we have no occasion to consider the alternative contention that they are entitled to a declaratory judgment. The alternative contention poses a number of difficult problems;[47] the rmedy to serve the pressing need for an undelayed judicial determination of these substantial claims of constitutional deprivations should be the traditional one in this area, habeas corpus. If, after a hearing, any of these convictions under attack is found to be invalid, the court may order the Warden to strike it from the administrative records and, henceforth, to hold the prisoners for service of the valid convictions only.[48]
 
 
 41
 For the foregoing reasons, we conclude that the orders dismissing these petitions without a hearing were erroneous.
 
 
 42
 Reversed and remanded.
 
 
 
 [1]
 Martin v. Commonwealth of Virginia, 4 Cir., 349 F.2d 781
 
 
 [2]
 Williams v. Peyton, 4 Cir., 372 F.2d 216
 
 
 [3]
 That is the rule in Virginia, Peyton v. Williams, 206 Va. 595, 145 S.E.2d 147 (1965)
 
 
 [4]
 Evans v. Cunningham, 4 Cir., 335 F.2d 491
 
 
 [5]
 For a very perceptive review of the writ's history, see D. J. Meador, Habeas Corpus and Magna Carta, University of Virginia Press (1966)
 
 
 [6]
 See the Habeas Corpus Act of 1679, 31 Car. II c. 7, 8 Statutes at Large 432-39 (1763)
 
 
 [7]
 Ex parte Parks, 93 U.S. 18, 23 L.Ed. 787 (1876); Ex parte Watkins, 28 U.S. (3 Pet.) 193, 7 L.Ed. 650 (1830)
 
 
 [8]
 14 Stat. 385 (1867). The present version is 28 U.S.C.A. 2241, 2243 (1958)
 
 
 [9]
 Ex parte Bridges, 4 Fed.Cas. pp. 98, 106, No. 1,862 (Cir.Ct.N.D.Ga.1875) (Mr. Justice Bradley). The same rule applied to federal prisoners. Ex parte Parks, 93 U.S. 18, 23 L.Ed. 787 (1876)
 
 
 [10]
 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969 (1915). It had some precursors in Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1879), and Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873)
 
 
 [11]
 Even so, the question of the mob's influence was held to have been foreclosed by the state appellate court's negative appraisal of it
 
 
 [12]
 McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934)
 
 
 [13]
 McNally v. Hill, 3 Cir., 69 F.2d 38
 
 
 [14]
 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953)
 
 
 [15]
 Brown v. Allen (Daniels v. Allen), 344 U.S. 443, 482-487, 73 S.Ct. 397, 97 L.Ed. 469 (1953)
 
 
 [16]
 372 U.S. 371, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)
 
 
 [17]
 Brown v. Allen, 344 U.S. 443, 38 S.Ct. 397, 97 L.Ed. 469 (1953)
 
 
 [18]
 Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)
 
 
 [19]
 See generally, Meador, supra, note 5
 
 
 [20]
 McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934)
 
 
 [21]
 It came close to it in Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), in which a prisoner was allowed to attack a second conviction which resulted in revocation of his parole and his recommitment under the earlier sentence, though he was held under the concededly valid first sentence. Ex parte Hull is not necessarily inconsistent with McNally v. Hill, but it was a significant departure from a mechanistic application of the old rule that habeas corpus is unavailable unless the court's order will procure the prisoner's immediate release. Heflin v. United States, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), may be regarded as an affirmation of McNally v. Hill, for, while the federal prisoner there was allowed to attack the future sentence under Rule 35 of Fed.R.Crim.P., five members of the Court were of the opinion that relief was unavailable under 28 U.S.C.A. 2255
 
 
 [22]
 4 Cir., 349 F.2d 781
 
 
 [23]
 4 Cir., 372 F.2d 216
 
 
 [24]
 We have previously expressed the great desirability of remedial procedures to achieve an early disposition of collateral attacks on criminal judgments. See Williams v. Peyton, 4 Cir., 372 F.2d 216; Mathis v. United States, 4 Cir., 369 F.2d 43; Martin v. Commonwealth of Virginia, 4 Cir., 349 F.2d 781. So has the Supreme Court. United States v. Smith, 331 U.S. 469, 476, 67 S.Ct. 1330, 91 L.Ed. 1610 (1947)
 
 
 [25]
 See generally, Meador, supra, Note 5
 
 
 [26]
 31 Car. II c. 7, 8 Statutes at Large, 432-439 (1763)
 
 
 [27]
 1 Stat. 81 c. 20 14 (1789)
 
 
 [28]
 See Ex parte McCardle, 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869); Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); Ex parte Merryman, 17 Fed.Cas. p. 144, No. 9,487 (Cir.Ct.D.Md.1861) (Chief Justice Taney)
 
 
 [29]
 14 Stat. 385 c. 28 (1867)
 
 
 [30]
 93 U.S. 18, 23 L.Ed. 787 (1876)
 
 
 [31]
 28 U.S. (3 Pet.) 193, 7 L.Ed. 650 (1830)
 
 
 [32]
 See also Ex parte Bridges, 4 Fed.Cas. pp. 98, 106, No. 1,862 (Cir.Ct.N.D.Ga.1875) (Mr. Justice Bradley), which did involve a state prisoner
 
 
 [33]
 Ex parte Siebold, 100 U.S. 371, 25 L.Ed 717 (1879); Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873)
 
 
 [34]
 See United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952)
 
 
 [35]
 Jones v. Cunningham, 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963)
 
 
 [36]
 372 U.S. 391, 424. 83 S.Ct. 822, 841, 9 L.Ed.2d 837 (1963)
 
 
 [37]
 Id. at 435, 83 S.Ct. at 847
 
 
 [38]
 See also Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941), in which, as we have noted, the Supreme Court departed from that requirement
 
 
 [39]
 28 U.S.C.A. 2241 (1958)
 
 
 [40]
 Va.Code Ann. 53-251 (1967)
 
 
 [41]
 See Peyton v. Williams, 206 Va. 595, 145 S.E.2d 147 (1965), upholding postponement in service of an earlier sentence from which the prisoner had been released on parole until completion of service of a later sentence which occasioned his recommitment and, later, parole revocation. The converse procedure occasioned the question with which the Supreme Court dealt in Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941)
 
 
 [42]
 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963)
 
 
 [43]
 4 Cir., 335 F.2d 67
 
 
 [44]
 Id. at 69
 
 
 [45]
 Tucker v. Peyton, 4 Cir., 357 F.2d 115
 
 
 [46]
 See also note 48, infra
 
 
 [47]
 See note, Postconviction Remedies: The Need for Legislative Change, 55 Geo.L.J. 851, 875-876 (1967)
 
 
 [48]
 We have been concerned with the construction of 28 U.S.C.A. 2241, which has been construed in pari materia with 28 U.S.C.A. 2255. The latter section extends the writ to a federal prisoner 'in custody * * * claiming the right to be released * * *,' and it has been suggested that the right to release clause of 2255 poses some conceptual difficulty in the way of our construction of 2241. If, as we have seen, however, the detention in a substantive sense is under each of two consecutive sentences, the prisoner may be effectively released from all of the burdens of the invalid sentence by the writ's execution. The right to release clause need not be construed as requiring a claim that he be set outside the prison's walls free of the restraint of the other valid sentence. Surely, it would not be given that construction if the sentence under attack was the one which the Warden said administratively was the one then being served. As we have said, the Warden's administrative determination of the sequence of sentence service is a technical irrelevance