John Henry **HEWETT**, Appellant,

v.

**STATE OF NORTH CAROLINA, R. L. Turner, Warden, Central Prison,** Appellees.

Jerry Ray **CASSADA**, Appellant,

v.

**STATE OF NORTH CAROLINA,** Appellee.

Nos. 11772, 12851.

United States Court of Appeals Fourth Circuit.

Argued May 6, 1969.

Decided Aug. 28, 1969.

Graham C. Lilly, Charlottesville, Va., Court-appointed counsel, for appellants.

Jacob L. Safron, Raleigh, N. C., Staff Atty., Office of Atty. Gen. of N. C. (Robert Morgan, Atty. Gen. of N. C., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BRYAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

We consolidated these habeas corpus appeals because each raises a question of mootness and a question of whether the petitioner was unconstitutionally denied the right to counsel when his probation was revoked. Petitioner Hewett's case also raises a question of exhaustion of available state remedies. We conclude that (a) Hewett exhausted state remedies as to his right to counsel at the revocation of his probation, and the district judge should have dealt with the issue of right to counsel on the merits, (b) the case of neither petitioner is moot, and (c) each petitioner had a right to counsel at the hearing on revocation of his probation, and this right was denied him. We reverse the judgments of the district courts, with directions to grant appropriate relief.

I

Petitioner Cassada was originally convicted in January, 1962, in a North Carolina Superior Court, upon pleas of guilty to two indictments charging breaking and entering, larceny and receiving stolen property. Resulting sentences of three to five years were suspended upon the conditions contained in N.C.Gen.Stat. § 15–199 (1965), *inter alia,* that he "[v]iolate no penal law of any state or the federal government and be of general good behavior." In November, 1965, Cassada pleaded guilty to other charges of carrying a concealed weapon and operating a motor vehicle without a proper driver's license and insurance. Immediately thereafter, he was brought before a judge for a determination of whether his probation on his first sentences should be revoked. At the hearing, Cassada requested that counsel be appointed to represent him, but this request was denied.[1] A violation of probation was found to have occurred and Cassada was sentenced to a term of imprisonment of from three to five years.

While imprisoned, Cassada petitioned the United States District Court for the Western District of North Carolina for a writ of habeas corpus on three occasions. After the first petition was denied because of Cassada's failure to exhaust available state remedies, he petitioned the Supreme Court of North Carolina for a writ of certiorari, but

---

1. Coincidentally, the judge before whom Cassada was brought had represented him at the original trial. The judge remarked, according to Cassada, "If you remember Jerry, I was your counsel in this case and I was the one who got you the suspended sentence in the first place so I know all there is to know concerning this case so you don't need a counsel."

the writ was denied by that court in May, 1966.

Following the state Supreme Court's denial of review, Cassada's next two petitions were filed *pro se*. The first contained several substantive allegations with which we are not concerned, and it was denied on June 10, 1966. The second alleged a denial of constitutional right in the failure to appoint counsel at the probation revocation proceeding. This petition was denied by the district court on the ground that no defendant, even though indigent, has a constitutional right to the appointment of counsel at a proceeding to revoke probation.

While Cassada's appeal was pending, but before oral argument, the state moved to dismiss the appeal on the ground that Cassada had finished serving his term and the case had, therefore, become moot.[2] We denied the motion, without prejudice to the state to raise the issue later in the proceedings.

## II

Petitioner Hewett was convicted in September, 1964, in a North Carolina Superior Court, upon his pleas of guilty to a series of charges, including storebreaking, larceny, escape from jail and injury to a building. Concurrent sentences of five to seven years were imposed, but service of the sentences was suspended and Hewett was placed on probation upon the conditions contained in N.C.Gen.Stat. § 15–199 (1965), *inter alia*, that he "[a]void injurious or vicious habits."

About two years later, proceedings were begun to determine if Hewett's probation should be revoked. The state presented several witnesses, who were questioned at length by the solicitor for the state, the testimony of whom tended to show that Hewett had violated the condition of probation which we have quoted. Hewett requested the assistance of counsel but, when this request was denied, he attempted to conduct his own defense by cross-examining the state's witnesses and testifying in his own behalf. At the conclusion of the proceedings the judge found that Hewett had engaged in "injurious and vicious habits" and ordered that his probation be revoked. Hewett was relegated to serve the concurrent jail sentences originally imposed. Hewett appealed, and the North Carolina Supreme Court affirmed, holding that the appointment of counsel at revocation of probation proceedings was not a constitutional requisite. The court theorized that the guilt-determining process ends after trial, conviction, sentence and appeal (if any); the only question at revocation proceedings is whether the terms of probation have been violated. If so, the originally imposed sentence is automatically activated. State v. Hewett, 270 N.C. 348, 154 S.E.2d 476, 479 (1967).

After the North Carolina Supreme Court had denied relief, Hewett filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. He alleged, *inter alia*, that his retention in prison was unlawful because he had been denied the assistance of counsel at the proceeding to revoke his probation. In the final paragraph of an addendum to his application, Hewett asserted that he had been under the "effect of drugs" (apparently prescribed during the course of hospital treatment) at the time of the revocation hearing. The district judge, without reaching the merits of the right to counsel issue, dismissed the entire petition on the theory that Hewett had failed to exhaust available state remedies concerning the allegation that he had been under the influence of drugs. Fail-

---

2. In its brief the state also argued that Cassada's appeal had become moot because, following his release, Cassada had disappeared and could not be located even by the attorney we appointed to represent him. However, during oral argument we were advised that Cassada had been located and was imprisoned in Raleigh, North Carolina. We do not consider, therefore, whether Cassada's case would have become moot if he had in fact disappeared.

ure to exhaust was held to oust federal habeas corpus jurisdiction.

### III

Hewett had exhausted the remedies available in the courts of North Carolina as to his claim that his constitutional right to counsel at the probation revocation proceeding had been denied. The contention was directly presented to the North Carolina Supreme Court in State v. Hewett, *supra,* and rejected. Exhaustion as to it had thus occurred. Grundler v. North Carolina, 283 F.2d 798, 800 (4 Cir. 1960).

The issue, then, is whether the introduction of the claim that he had been under the "effect of drugs" at the time of the revocation hearing, in a memorandum attached to Hewett's third petition *pro se* for habeas corpus, should be permitted to delay the determination of the right to counsel issue as to which exhaustion had clearly occurred. The answer is suggested in Hunt v. Warden, Maryland Penitentiary, 335 F.2d 936, 939–941 (4 Cir. 1964), where, after extensive review of Supreme Court decisions, we stated in regard to the rule of exhaustion codified in 28 U.S.C.A. § 2254 (b) "[i]n sum, exhaustion is a doctrine of comity; not a definition of power," and in Williams v. Coiner, 392 F.2d 210, 213 n. 2 (4 Cir. 1968), in which we pointed out that exhaustion "is not a jurisdictional concept but simply a flexible matter of comity." Moreover, in Williams, we directed the district court, upon remand, to determine an issue as to which exhaustion had not occurred because it was closely connected with an issue which had been fully presented to the state courts.

Directly in point are cases which hold that a district court must consider an exhausted claim even though an unrelated claim is pending in the state courts, United States ex rel. Sniffen v. Follette, 393 F.2d 726 (2 Cir. 1968), and that a district court may not dismiss a petition *in toto* when both exhausted claims and unrelated unexhausted claims are contained in the same petition, United States

ex rel. Levy v. McMann, 394 F.2d 402 (2 Cir. 1968).

 These cases, which we find persuasive, are fully applicable here. From the standpoint of comity, further proceedings should not be required in the state courts with regard to the issue of right to counsel. If it is assumed that Hewett has properly raised the question of drug influence, this claim is in no way related to the right to counsel contention. Since the latter has been fully explored by the state courts, it is ripe for federal consideration. We conclude that the district judge was in error in dismissing the petition on this ground.

### IV

Although both petitioners have served the terms of imprisonment imposed when the probation was revoked, we conclude that neither case is moot.

In Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), the Supreme Court held that federal habeas corpus jurisdiction was not ousted when, pending disposition of the application for the writ, a prisoner was released after having served his full sentence. More recently, the Court has stated flatly that the "mere possibility" that "adverse collateral legal consequences" will flow from a prior conviction is sufficient to rescue the case from the potential "limbo of mootness." Sibron v. New York, 392 U.S. 40, 55, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917 (1968). See, Ginsberg v. New York, 390 U.S. 629, 633 n. 2, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

 In the instant appeals North Carolina seeks to distinguish these decisions on the ground that there criminal convictions were involved, whereas here the underlying convictions have not been challenged and will, therefore, remain in full effect no matter what we decide today. This distinction is not persuasive. See, Pollard v. United States, 352 U.S. 354, 358, 77 S.Ct. 471, 1 L.Ed.2d 393 (1957) (only sentence and not conviction challenged). If adverse collateral legal

consequences may possibly flow from the revocations of probation, we see no reason why the right to counsel issue should be considered moot; otherwise, petitioners may suffer actual adverse collateral legal consequences stemming from the alleged constitutional deprivation. We consider, therefore, whether adverse collateral legal consequences may result from the revocations of probation.

Petitioners assert that several such consequences may flow from the revocations of probation. They argue that their future employment opportunities will be curtailed, because employers will be more reluctant to hire individuals whose probation has been revoked. We do not find this argument persuasive. First, there is at least room for doubt that an employer receiving an employment application from an individual with a fairly extensive criminal record would be substantially influenced to employ or not to employ him by the mere fact that on a given occasion parole had been revoked. More significantly, however, in the Supreme Court cases cited, particularly *Sibron,* the Court stated the text

to obviate mootness in terms of collateral *"legal"* consequences. Diminution of employment opportunities does not usually fall into this concept, except to the extent that an affected individual may seek public employment.

Petitioners also argue that whether or not they were actually incarcerated will have an effect upon the time at which they may, under state law, petition the courts for restoration of their civil rights, i. e., the right to vote, to serve as a juror, to hold elective office, etc. North Carolina law provides that anyone who is incarcerated may, after the expiration of *two* years from the date of his discharge from custody, petition for restoration of his civil rights.[3] North Carolina law also provides that where the court suspended the effect of its judgment of incarceration the individual convicted may petition *immediately* for the restoration of his civil rights.[4] We conclude that this distinction recognized in the law of North Carolina is sufficiently important to preserve petitioners' cases from being moot.[5] See, Sibron v. New York, *supra,* 392

---

3. N.C.Gen.Stat. § 13–1 (1953) provides that "[a]ny person convicted of an infamous crime, whereby the rights of citizenship are forfeited, desiring to be restored to the same, shall file his petition in the superior court, setting forth his conviction and the punishment inflicted, his place or places of residence, his occupation since his conviction, the meritorious causes which, in his opinion, entitle him to be restored to his forfeited rights, and that he has not before been restored to the lost rights of citizenship." Section 13–2 provides that such a petition may be filed "[a]t any time after the expiration of two years from the date of discharge of the petitioner * * *."

4. N.C.Gen.Stat. § 13–6 (1953) provides in part that "[a]ny person convicted of any crime, whereby the rights of citizenship are forfeited, and the judgment of the court pronounced does not include imprisonment anywhere, and pardon has been granted by the Governor, or the court suspended judgment on payment of the costs, and the costs have been paid, such person may be restored to such forfeited rights of citizenship upon application, by petition, to the judge presiding at

any term of the superior court held for the county in which the conviction was had, one year after such conviction. * * * [I]n all cases where the court suspended judgment it shall not be necessary to allege or prove that pardon as [sic] been granted by the Governor, and in such cases the petition may be made and the forfeited rights of citizenship restored at any time after conviction."

5. Some difficulty with this conclusion may arise in the case of Cassada who, we were informed at oral argument, is presently in prison in North Carolina. We have not been given any further information concerning his imprisonment. If Cassada has been convicted anew, it would appear that his prior revocation of probation could in no event have any effect upon the *time* at which he will be in a position to petition for the restoration of his civil rights. Nevertheless, it must be noted that the granting of that relief depends upon the findings and conclusions of the judge to whom the petition is addressed. Certainly a prior revocation of probation is a significant factor which the judge would take into account in determining the merits of the petition.

U.S. at 55, 88 S.Ct. 1889; United States v. Morgan, 346 U.S. 502, 512–513, 74 S.Ct. 247, 98 L.Ed. 248 (1954).

■ Petitioners argue additionally, and we agree, that in the event either of them has future difficulties with the law the sentencing judge would have broad discretion to take into account the prior criminal record of the accused. See e. g., N.C.Gen.Stat. §§ 15–197, 15–198 (1965). Any judge who might be called upon to consider probation or sentence for future offenses for either of petitioners would be bound to be influenced by that petitioner's prior probationary experience. Nor do we believe that the fact that petitioners are multiple offenders requires a different conclusion. See, Sibron v. New York, *supra,* 392 U.S. at 56, 88 S.Ct. 1889.

### V

The key to decision as to whether petitioners were unconstitutionally denied the right to counsel when their probation was revoked is consideration of Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). In the context of the State of Washington's unique revocation of probation and deferred sentencing procedure, *Mempa* held that the appointment of counsel was constitutionally required when proceedings to revoke probation were conducted. In *Mempa* the Court dealt with a situation in which no sentence was initially imposed, imposition being delayed until such time as probation was revoked.

Many lower federal courts have read *Mempa* narrowly to apply only to the factual context of the singular state procedure with which that case dealt. See, e. g., Williams v. Patterson, 389 F.2d 374 (10 Cir. 1968) (*Mempa* inapplicable to parole revocation proceeding); United States ex rel. Bishop v. Brierly, 288 F. Supp. 401 (E.D.Pa.1968); Holder v. United States, 285 F.Supp. 380 (E.D. Tex.1968); Sammons v. United States, 285 F.Supp. 100 (S.D.Tex.1968); United States v. Hartsell, 277 F.Supp. 993 (E.D. Tenn.1967). On the other hand, Ashworth v. United States, 391 F.2d 245 (6 Cir. 1968), has held that *Mempa* establishes the right to counsel at federal revocation of probation proceedings. A similar result was reached with regard to revocation of probation under New Jersey law in State v. Seymour, 98 N.J. Super. 526, 237 A.2d 900 (N.J.App.Div. 1968). See, generally, Note, Constitutional Law—Right to Counsel—State Courts Split on Probationers Right to Counsel at Revocation Hearing, 42 N.Y. U.L.Rev. 955 (1967).

■ As we read *Mempa* we are persuaded, unlike the majority of the decisions which deny the right to counsel, that it cannot be limited to its narrow factual context. The principle which undergirds that decision is broad indeed, "appointment of counsel for an indigent is required at *every stage* of a criminal proceeding where *substantial rights* of a criminal accused may be affected." (emphasis supplied.) 389 U.S. at 134, 88 S.Ct. at 257. While the right to counsel applies to "criminal proceedings," we have little doubt that the revocation of probation is a stage of criminal proceedings. Even if a new sentence is not imposed, it is the event which makes operative the loss of liberty. Consistent with the basic principle of *Mempa,* we must consider whether North Carolina's revocation procedure may affect the substantial rights of the individual involved; our inquiry is not concerned with whether North Carolina's procedure is a carbon copy of that employed by the State of Washington.

■ To begin with, we recognize that at stake in a revocation of probation proceeding is individual liberty, and the substantiality of this right may not be disputed. We are not impressed by the argument that probation is a "mere" privilege, or a matter of grace, rather than a right and that, therefore, various constitutional mandates, including the right to counsel, should be held to be inapplicable. Even if a distinction exists between the components of the right-

privilege dichotomy,[6] when a state undertakes to institute proceedings for the disposition of those accused of crime it must do so consistently with constitutional privileges, even though the actual institution of the procedure was not constitutionally required. See, *e. g.*, Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (plurality opinion).

With regard to North Carolina revocation of probation procedure, the state argues that the revocation procedure is a narrow factual inquiry, and if the judge finds that the conditions of probation have been violated, his only recourse is to require the accused to serve the sentence which had been imposed originally and then suspended. Petitioners, on the other hand, contend that, under N.C.Gen.Stat. § 15–200 (1967 Supp.), the judge who revokes probation has complete discretion to impose any sentence, irrespective of the terms of the suspended sentence.[7] While we agree that, in the absence of a controlling North Carolina decision, the language of § 15–200 lends itself to the interpretation which petitioners advocate, we need not decide this controversy because, even if we assume that the revocation judge's powers are circumscribed as the state suggests, it is clear that the judge does have discretion whether to revoke a probation upon his finding that a condition of probation has been violated.[8] Thus, liberty hangs in the balance. We conclude, therefore, that substantial rights of a criminal accused may be affected as a result of the North Carolina revocation of probation procedure.[9]

■ The transcript of the revocation proceedings in the Hewett case would dispel any doubt that we might have concerning the necessity for the presence of counsel at the inquiry. The charge itself was vague and ambiguous; Hewett unsuccessfully sought to have it explained to him.[10] In violation of the North Carolina rule, hearsay evidence was freely admitted. State v. Hewett, *supra*,

---

6. See, generally, Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968).

7. N.C.Gen.Stat. § 15–200 (1967 Supp.), about which the argument revolves, provides that if a presiding judge finds a violation of a condition of probation he "*may* revoke the probation or suspension of sentence and shall proceed to deal with the case as if there had been no probation or suspension of sentence." (emphasis supplied.)

8. To quote from the state's brief, it is said: "The only alternatives available to the court at a probation revocation hearing are to (1) revoke the probation and enter judgment or put into effect the suspended sentence on probation, or (2) not to revoke and to either continue, extend, suspend, terminate or discharge the period of probation of such probationer." Thus, the state concedes substantial discretion in a judge deciding an alleged violation of a condition of probation case.

9. We note in passing that under the Washington procedure involved in *Mempa* the judge had *no* sentencing discretion. He was required to impose the maximum permissible sentence, albeit with a recom-

mendation to the Board of Prison Terms and Paroles, which was the body that actually determined the duration of imprisonment. Additionally, in *Mempa*, the Supreme Court pointed out that counsel was necessary at the revocation proceeding in order to insure that the accused was advised concerning certain rights to appeal and to withdraw guilty pleas. The North Carolina revocation procedure does not contain these precise elements, although revocation of probation may be appealed.

10. The record shows that after Hewett's motions for a continuance and the appointment of counsel were overruled, the following exchange between the court and Hewett occurred:
"[The Court]: * * * What we are discussing now is whether to continue your probation and whether or not you have avoided injurious and vicious habits.
[Hewett]: What is vicious? Explain this case to me.
[The Court]: In all this evidence here they are bringing out and have told about your being hostile toward people when meeting them on the street and about slapping them."
Following the exchange, a luncheon recess was taken and no further explanation was given Hewett in the later proceedings.

154 S.E.2d at 482.[11] While many cases characterize a revocation of probation proceedings as an informal one, almost all of the prosecutor's questions to his own witnesses were leading.[12] Although in Hewett's appeal from the revocation of his probation, the Supreme Court of North Carolina did consider his various contentions on the merits, it called attention to the general rule in North Carolina that the Supreme Court "will not consider questions not properly presented by objections duly made, exceptions duly entered, and assignments of error properly set out," State v. Hewett, *supra*, 154 S.E.2d at 478, at the same time holding that N.C.Gen.Stat. § 15–4.1 (1965), authorizing the appointment of counsel for indigent defendants in criminal trials does *not* apply to the appointment of counsel for indigent defendants in a proceeding to revoke probation. State v. Hewett, *supra*, 154 S.E.2d at 480. The congruence of these various elements leads us to conclude that there was manifest unfairness in the proceedings.

Cassada's case is somewhat different. His probation was revoked because of the subsequent commission of another crime, a fact which is ordinarily easily susceptible of proof. The difference between Hewett's and Cassada's cases has prompt-ed us to consider whether we should hold that the appointment of counsel is required only in those circumstances in which counsel is most needed as, for example, when an extensive factual inquiry is in the offing.

█ We have concluded not to draw such a distinction. As we read *Mempa,* its holding applies whenever substantial rights may be affected and, as we have shown, substantial rights are litigated in every North Carolina revocation of probation proceeding, irrespective of the preciseness of the claimed violation or the complexity of the factual inquiry. Technically, a minor traffic offense would constitute a violation of the condition of probation with which Cassada was charged; yet it can hardly be supposed that every violation of this nature should require revocation of probation and service of the original sentence. Moreover, in one of the cases considered in *Mempa,* the probationer admitted in the revocation proceeding that he had committed a subsequent crime and his probation was forthwith revoked on that basis. Notwithstanding, it was held that he should have been afforded counsel. Finally, our conclusion is supported by the rejection of the empirical approach of

---

11. In federal revocation of probation proceedings, the rule in this circuit is to the contrary. United States v. Cates, 402 F.2d 473 (4 Cir. 1968).

12. Typical of the foundation for this statement is the following:

"[Solicitor]: Officer Heye, isn't it a fact that people in Chadbourn over there are almost afraid to meet this man [Hewett] on the street over there? Haven't you had complaint after complaint over there about it?

[Policeman-Witness]: Yes, sir. We have had complaints.

[Solicitor]: And they even cross the street to keep from meeting over there on the streets of Chadbourn, isn't that a fact?

[Policeman-Witness]: Some do, yes, sir.

[Solicitor]: Well, do you know of any other person that he has walked along the street and slugged or made passes at?

[Policeman-Witness]: No, sir, not that we have had any knowledge, that have been reported.

[Solicitor]: I mean, reports that you have had.

\* \* \* \* \*

[Solicitor]: Didn't Brown tell you over there at the police station \* \* \* that Brown would get beat up by this man [Hewett] if he took a warrant out against him.

[Policeman-Witness]: Brown said it wouldn't do no good to take a warrant out on him. I said, well, I said, until you go through due process of law, I said, you don't know whether it will do any good or not. He said, no, he said, it won't. He said—I said, why not. He said, I would probably have to wind up killing him.

[Solicitor]: That he was scared of him?

[Policeman-Witness]: He didn't come out and say that."

Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), by the decision in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Since *Gideon*, the Supreme Court has not premised the right to counsel upon the aggravated circumstances of particular cases. We add, too, that if we were to adopt a case by case approach, articulation of where the line should be drawn between those who should have been supplied with counsel and those who may be denied counsel, would be most difficult, if not impossible. Even the most superficially frivolous proceeding may reveal to competent counsel procedural or substantive irregularities which require correction in order to safeguard the interests of a probationer. We, therefore, conclude that counsel must be appointed for indigents in all revocation of probation proceedings conducted under the law of North Carolina, or the law of any other jurisdiction where the procedure similarly affects the substantial rights of the individual.

## VI

■ Because both petitioners have been released from the restraints which they suffered as a result of revocation of their probation, we shall reverse the judgments of the district courts and direct the entry of orders which require, alternatively, that North Carolina institute new revocation of probation proceedings at which petitioners shall be represented by appointed counsel, or that North Carolina void the previous revocation proceedings and expunge them from any and all records maintained by North Carolina with respect to petitioners, to the end that petitioners may be relieved of any collateral legal consequences stemming from the revocations.

Reversed with directions.

HAYNSWORTH, Chief Judge (concurring):

I subscribe to the opinion of my brother, WINTER, though I wish to add a word about the problem of justiciability.

The Supreme Court has told us plainly that, when the sentence expires after the filing of the habeas petition, we are to deal with the problem in terms of mootness rather than of present custody. Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554; Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917. I agree that, under the standards of mootness those cases prescribe, a bare possibility of adverse collateral consequences is enough to preserve the justiciability of the litigation. There is such a bare possibility here, but very bare it is.

These are multiple offenders. One already is now again in prison. Neither has claimed an interest in restoration of his right to vote, to serve on juries or to run for elective office. If either should have such a wish, his record would prevent his entertaining any reasonable hope of its fulfillment in the absence of long years of demonstrated rehabilitation. The great probability is that what we do today, after expending a fair amount of judicial effort, is and will be wholly meaningless to either man in its practical application.

In another case that might not be so. Revocation of probation after one conviction could have important collateral consequences to the legal rights and to the social and economic affairs of the individual. If mootness is not to be found in that situation, perhaps it should be found in none, for arbitrary lines of demarcation are harsh and the resolution of justiciability problems ought not ever be made to depend upon preliminary litigation of fact questions such as the individual's interest in the restoration of his forfeited rights and his practical chances of obtaining it.

If such collateral consequences are of some practical importance to the individual, however, I gravely doubt that he would understand that he would be entitled to their adjudication if he filed his petition the day before his discharge from prison but not if he filed the day after. His interest in either event is the same, but we could act in the latter case only if it were found that after his unconditional release, he was still in the custody of the state under the earlier commitment. This court has been in the forefront of the relaxation of the more rigid and technical concepts involved in the definition of custody,[*] but I do not think we could find such custody here. If the petition had been filed promptly and the courts had not moved the proceeding to final adjudication until too late to grant release from prison, the relief the man sought, relief from collateral consequences of the conviction or probation revocation might be thought appropriate as a small consolation for the law's delay, but these proceedings are not appropriate for trials of the courts. The present rule has the virtue of providing a clear measure by which to answer the question of justiciability, without preliminary litigation, but it makes no distinction between those who have some practical interest in litigating and those who do not. When the indigent can freely litigate without cost to himself, there are no collateral circumstances tending to separate the practically interested litigants from the disinterested.

Courts, already greatly burdened, ought not to be required to spend a vast amount of time laboriously bringing forth decisions of no practical consequence to anyone. There is too much of importance to do more promptly than it now can be done to divert our efforts to jousting with windmills. As long as a potential interest in the restoration of civil rights to felons is alone enough to avoid dismissals of habeas proceedings for mootness, however, we will move in an esoteric and hypothetical area of the law.

---

[*] Rowe v. Peyton, 4 Cir., 383 F.2d 709, aff'd sub. nom. Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426; Word v. North Carolina, 4 Cir., 406 F.2d 352.