**Frank WEST, Jr., Appellant,**

v.

**W. K. CUNNINGHAM, Director, Division of Corrections, Appellee.**

No. 71–1392.

United States Court of Appeals, Fourth Circuit.

Feb. 23, 1972.

Frank West, Jr., pro se.

Edward J. White, Asst. Atty. Gen., Richmond, Va., for appellee.

Before SOBELOFF, Senior Circuit Judge, and WINTER and CRAVEN, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

Invoking 42 U.S.C. § 1983, Frank West, Jr., brought the present action to compel his release from the maximum security wing ("C" building) of the Virginia State Penitentiary. West alleged his confinement to "C" building, with its attendant loss of privileges, was an arbitrary punishment, imposed by the prison administrators without reason and without affording him any of the procedural protections mandated by the Due Process Clause. In February of 1971, after two and one half years of "administrative segregation," West was returned to the general prison population and the District Court, asserting

that "plaintiff has been granted the relief he sought," dismissed the action as moot.

Plaintiff then filed a paper entitled "Motion to Re-Open" in which he asserted that despite his return to the general prison population, his case was not moot. He insisted that, unless expunged, the record of his illegal punitive confinement will jeopardize his future chances for pardon or parole. The District Court denied the motion.

We disagree with the District Court that this case has been rendered moot by West's release from "C" building. Where there remains a "possibility" that "adverse collateral legal consequences" will inure to the complaining party, a case such as this is not moot. Sibron v. New York, 392 U.S. 40, 55, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Wood v. Ross, 434 F.2d 297 (4 Cir. 1970); Hewett v. North Carolina, 415 F.2d 1316, 1322 (4 Cir. 1969); Marston v. Oliver, 324 F.Supp. 691 (E.D.Va.1971). In this case, the notation on West's prison record of the imposition of "administrative segregation" for over two years could well prejudice his future chances for pardon or parole. Moreover, Virginia law forbids the accumulation of time off for good behavior while a prisoner is undergoing discipline for a violation of prison rules.[1] Va.Code Ann. § 53–151 (1967 Replacement Volume).

In Hewett v. North Carolina, *supra*, this circuit held that petitioners could complain of an unconstitutional denial of counsel at a probation revocation hearing even after their sentences had been fully served. That case was not moot because the return to jail after probation revocation worked to postpone the time when the ex-prisoner could petition for the restoration of his civil rights. Also, the court noted that, should the petitioners again run afoul of the law, the record of probation revocation would influence a future sentencing judge in his determination whether or not to grant probation once again. See 415 F.2d at 1321–1322.

The harmful consequences which could spring from West's record of administrative discipline are at least as serious as those preventing mootness in *Hewett*. If, as West alleges, he has been punished in an arbitrary manner, without a hearing, without specification of the charges against him and without an opportunity to defend himself, and when the adverse consequences of the disciplinary action are continuing, redress, when it is practicable, should be granted.[2] Although

---

1. This circuit has previously considered and rejected an argument by the prison authorities that confinement to "C" building is merely "segregation" for "the good of the institution" and not discipline for the violation of prison regulations. Under this rejected view, the courts would have no power to interfere with the authorities' decision to confine an inmate in "C" building. On this point, we have said:

   While confinement in "C" building is not as harsh as solitary confinement, * * * prisoners in "C" building are not permitted to work and earn money; they are allowed only two meals a day, and are deprived of radio, television and movie privileges; they do not have access to the library and are not permitted to attend educational classes; they are allowed to bathe only once a week, as opposed to daily bathing allowed other prisoners. It is also highly significant that the Parole Board declines to con-

   sider as eligible for parole any prisoner who is confined in ["C" building]. These deprivations cannot be treated as insubstantial.

   Howard v. Smyth, 365 F.2d 428, 429–430 (4th Cir.), cert. denied, 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966). *See also* Abernathy v. Cunningham, 393 F.2d 775 (4th Cir. 1968); Landman v. Peyton, 370 F.2d 135 (4th Cir.), cert. denied, 385 U.S. 881, 87 S.Ct. 168, 17 L.Ed.2d 108 (1966).

2. West's confinement arose from a "work stoppage" at the Penitentiary in July of 1968. In an affidavit filed with the District Court, one of the prison administrators sums up the proof underlying West's administrative segregation:

   In July of 1968, [West] was involved in a work stoppage at the penitentiary. While [West] was never actually caught in the act of instigating, it was felt that he was actively involved. This be-

the relief originally sought is no longer available, we should not shrink from doing whatever is possible to erase any lingering prejudice to West from the allegedly unconstitutional activities of the prison administrators. To this end, plaintiff should have an opportunity to prove the allegations in the complaint and show his entitlement to appropriate relief.

The judgment of the District Court is reversed and the case is remanded for further proceedings.

lief was based on information and "tips" gained in conversation with inmates, observation of [West] and his associations among the inmate population. This information, collectively caused experienced custodial personnel to believe [West] was an instigator and he was placed on padlock to separate him from the general inmate body.

One and one-half years after West's confinement began, a commission composed of Penitentiary officials interviewed plaintiff and declined to release him:

The committee believed (based on inmate conversation, the opinion of custodial personnel who had contact with [West] and [West's] reputation) that he was a manipulative personality who, though he never took part in actual nefarious schemes, acted through other inmates to achieve his goals. It was felt that his social intercourse with the general population should be restricted, at least for the time being.