John J. MORRISSEY, Appellant,

v.

Lou V. BREWER, Warden, Appellee.

G. Donald BOOHER, Appellant,

v.

LEE AND O'BRIEN COUNTIES and the State of Iowa, et al., Appellees.

Nos. 20328, 20425.

United States Court of Appeals, Eighth Circuit.

April 21, 1971.

Lay, Circuit Judge, dissented and filed opinion in which Heaney and Bright, Circuit Judges, concurred.

---

W. Don Brittin, Jr., Des Moines, Iowa, for appellants.

Michael J. Laughlin, Asst. Atty. Gen., Des Moines, Iowa, Richard C. Turner, Atty. Gen., Des Moines, Iowa, for appellees.

Before MATTHES, Chief Judge, and VAN OOSTERHOUT, MEHAFFY, GIBSON, LAY, HEANEY and BRIGHT, Circuit Judges, En Banc.

MATTHES, Chief Judge.

These consolidated appeals are from orders entered in two separate cases in the United States District Court for the Southern District of Iowa denying appellants' petitions for writs of habeas corpus.

Appellant John J. Morrissey was convicted in January of 1967 in the District Court of Iowa, Linn County, upon his plea of guilty to the charge of false drawing or uttering of checks in violation of Iowa Code § 713.3 (1966), and was sentenced to a term of imprisonment not to exceed 7 years. After serving a part of this sentence in the Iowa State Penitentiary, Morrissey was paroled from the institution on June 20, 1968. On January 24, 1969, he was arrested as a parole violator, and on January 31, 1969, after review of the parole officer's report, the Iowa Board of Parole entered an order revoking his parole, whereupon he was returned to the Iowa State Penitentiary.[1]

---

1. The Iowa Board of Parole revoked appellant Morrissey's parole on the basis of a report submitted January 28, 1969, by the parole agent charged with his supervision. The report set forth numerous violations of the conditions of Morrissey's parole including, *inter alia*, purchase of an automobile under an assumed name and unauthorized operation of this vehicle, purchase of furniture by use of an assumed name in order to obtain credit, and several violations of the employment conditions of his parole agreement.

Appellant G. Donald Booher was convicted in April of 1966 in the District Court of Iowa, O'Brien County, upon his plea of guilty to the charge of forgery in violation of Iowa Code § 718.1 (1962), and was sentenced to a term of imprisonment not to exceed 10 years. Having served a portion of this sentence in the Iowa State Penitentiary, Booher was granted a parole on November 14, 1968. In August of 1969, however, Booher was arrested for violation of his parole. On September 13, 1969, on the basis of a report of violations filed by Booher's parole officer, the Iowa Board of Parole revoked his parole, and he was recommitted to the Iowa State Penitentiary to complete service of his sentence.[2]

After unsuccessfully pursuing state remedies,[3] each appellant, in separately filed actions, petitioned the federal district court for a writ of habeas corpus alleging that his constitutional rights had been violated because he did not receive a hearing upon revocation of his parole. Morrissey's petition was denied by order entered April 15, 1970, Booher's by order of June 16, 1970. The district court denied applications for certificates of probable cause to appeal in each case.

2. On September 8, 1969 the parole officer charged with the supervision of appellant Booher filed a report with the Iowa Board of Parole which charged that Booher, in violation of specific conditions of his parole, had left the territorial limits of O'Brien County, Iowa, without the consent of his parole officer, had obtained an Iowa driver's license by use of an assumed name after suspension of his own license for a serious traffic violation, and had unlawfully operated a motor vehicle using this falsely obtained license. The report also set forth a number of violations relating to the employment conditions of his parole agreement.

3. Appellant Morrissey petitioned the District Court, Lee County, Iowa, alleging that he should have been granted a hearing relative to his parole violation. This was denied on June 26, 1969. Subsequently, he filed a petition for writ of habeas corpus in the Supreme Court of Iowa, which was dismissed on the grounds that the petition was not made to the court or judge most convenient to him; that the legality of his confinement had been adjudicated by the Lee County District Court's ruling; and, that if he was entitled to any relief the proper remedy was by way of appeal from the denial of his habeas petition. Morrissey filed a notice of appeal from this denial to the Iowa Supreme Court, which was dismissed by that court on September 12, 1969 because not timely filed.

Appellant Booher filed a petition for writ of habeas corpus in the District Court of Lee County, Iowa, alleging that his constitutional rights were violated because he had not been granted a hearing relative to his parole revocation. This petition was denied on November 26, 1969. Booher subsequently filed two other petitions with the Lee County District Court which were summarily denied. He also filed a number of other documents with the Iowa courts variously denominated as writs of equity, mandamus, injunction, notice of default and motion to vacate judgment, all of which were summarily dismissed by the courts to which they were addressed. Booher did not appeal to the Iowa Supreme Court from any of these denials. However, he was advised by letter of the County Attorney of O'Brien County, Iowa, that the Iowa Supreme Court had repeatedly taken the position that a parolee was not entitled to a hearing on parole revocation.

For purposes of exhaustion of state remedies it would have been more orderly had appellants properly perfected appeals to the Iowa Supreme Court from the denial of relief in the lower state courts. However, in view of the consistent position taken by the Iowa Supreme Court in holding that there is no constitutional right to a hearing in revocation proceedings (Cole v. Holliday, 171 N.W.2d 603 (Iowa 1969); State v. Rath, 258 Iowa 568, 139 N.W.2d 468 (1966); Curtis v. Bennett, 256 Iowa 1164, 131 N.W.2d 1 (1964), cert. denied, 380 U.S. 958, 85 S.Ct. 1096, 13 L.Ed.2d 974 (1965); Pagano v. Bechly, 211 Iowa 1294, 232 N.W. 798 (1930)), as discussed infra, it appears that an appeal on this issue to the Iowa Supreme Court would be futile. In Cole v. Holliday, supra, 171 N.W.2d at 606, that court stated that it would adhere to its position unless the United States Supreme Court preempted this area of the law. Moreover, appellees do not contend that appellants should have made any further attempts to exhaust state remedies.

Subsequently, our court granted certificates of probable cause, appointed counsel, and ordered that the appeals be consolidated and submitted to the court en banc.

The sole issue presented for review is whether appellants' constitutional rights to due process were violated when the Iowa Board of Parole revoked their paroles without a hearing. Appellants contend that the Due Process Clause of the Fourteenth Amendment requires that a hearing be held prior to the revocation of parole, that at such hearing they be given the opportunity to confront and cross-examine witnesses and to present evidence on their own behalf.

Consideration of the issue raised by appellants requires an understanding of the Iowa procedure for the granting and revocation of paroles. By statute, Iowa Code § 247.1 et seq., Iowa has created an independent three member board of parole which is appointed by the governor with the approval of the senate. Not more than two members may belong to the same political party, and at least one member must be a practicing attorney. For administrative purposes, the board is a part of the department of social services. The legislature has conferred upon the board the power to grant paroles to convicted persons committed to the state penitentiary or reformatory and to establish rules and conditions under which paroles may be granted. Once an inmate is placed on parole, he is under the supervision of the director of the division of corrections of the department of social services, but while on parole, he remains in the legal custody of the warden or superintendent and under the control of the chief parole officer. Section 247.9 of the Iowa Code provides that all paroled prisoners are subject, at any time, to be taken into custody and re-turned to the institution from which they were paroled. Parole agents charged with the supervision of paroled persons may not revoke a parole, but may recommend that the board of parole take this action.

The Iowa statutes neither prohibit nor expressly provide for notice and hearing before revocation of parole.[4] In Curtis v. Bennett, 256 Iowa 1164, 131 N.W.2d 1 (1964), cert. denied, 380 U.S. 958, 85 S.Ct. 1096, 13 L.Ed.2d 974 (1965) one of the questions presented to the Iowa Supreme Court was whether the Iowa statutes should be interpreted as requiring that a hearing be afforded prior to revocation of parole. In addressing itself to this issue, the court held:

> "The Iowa statutes do not provide for such a hearing before the parole board. The board is given no power to issue subpoenaes nor swear witnesses. There is nothing in the statutes which expressly or by implication requires the board to enter findings of fact of the kind made by judicial bodies. The absence of such provisions shows the legislature did not intend that the board should conduct any such hearings. In other words, the Iowa statutes contemplate that the board of parole shall be guided by the information which shall become available to it through its own investigation procedures. It is thus an administrative function rather than judicial. When the board grants a prisoner a parole, it does so as a matter of grace and not as a duty. It has the right to impose such conditions as it feels proper and, when the prisoner accepts the parole, he does so subject to its terms and conditions. He cannot later in a judicial hearing complain as to their fairness or propriety."

Id. at 3–4.

---

4. Some states, by express statutory provision, require notice and hearing prior to revocation of parole. Other states by statute expressly dispense with the necessity of notice and hearing before revocation. However, it appears that the majority of states, like Iowa, have nei-ther reserved the right of summary revocation nor required notice and hearing by express legislative enactment. For discussion of the various types of statutes and their judicial interpretation, see 29 A.L.R.2d Anno. 1074.

In Curtis v. Bennett, the Iowa court also held that a parolee had no constitutional right to notice and hearing before the board could revoke his parole. In so holding, the court reaffirmed the position taken in its earlier decision in Pagano v. Bechly, 211 Iowa 1294, 232 N.W. 798 (1930), that parole is a matter of grace on the part of the sovereign and that a defendant acquires no vested rights when granted a parole.[5]

As the district court noted in the orders denying appellants' petitions for habeas corpus, our court has approved the procedure followed by Iowa on revocation of parole. In Curtis v. Bennett, 351 F.2d 931 (8th Cir. 1965)[6] we held:

"The Iowa Court in its opinion sets out the contentions made by the petitioner and holds that all proceedings in connection with petitioner's parole, the revocation thereof and his retaking are in conformity with Iowa law. Petitioner makes the same contentions here. We believe that all of the contentions now urged by petitioner were fairly considered and properly answered by the Iowa Supreme Court.

"A parole is a matter of grace, not a vested right. A large discretion is left to the States as to the manner and terms upon which paroles may be granted and revoked. Federal due process does not require that a parole revocation be predicated upon notice and opportunity to be heard."

Id. at 933.

Appellants, however, urge that we reexamine the position espoused in *Curtis*, and hold that the revocation of their paroles without a hearing was violative of the basic requirements of due process.

For support appellants rely almost exclusively upon and adopt the reasoning of the opinion in Hahn v. Burke, 430 F.2d 100 (7th Cir. 1970). In *Hahn,* the Seventh Circuit held that the revocation of *probation* without a hearing violated the probationer's constitutional right to due process under the Fourteenth Amendment. In so holding, the court recognized that probation is a privilege and not a right, but found that "essential procedural due process no longer turns on the distinction between a privilege and a right." Id. at 103. In reaching this conclusion the Court applied the reasoning of the Supreme Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), in which it was held that termination of public assistance payments to a welfare recipient by the State without affording him a pre-termination evidentiary hearing deprives the recipient of procedural due process in violation of the Fourteenth Amendment. In *Goldberg,* the Supreme Court found that welfare " * * * benefits are a

---

5. The Iowa Supreme Court also discussed and gave approval to the other views supporting the holding that there is no constitutional right to notice and hearing upon revocation of parole. These views, set out in the court's opinion in Curtis v. Bennett, 256 Iowa 1164, 131 N.W.2d 1, 3 (1964), cert. denied, 380 U.S. 958, 85 S.Ct. 1096, 13 L.Ed.2d 974 (1965) and in 29 A.L.R.2d Anno. 1074, 1077–78 include the theory that conditional liberty after conviction does not free the prisoner from service of his sentence, but merely extends the prison walls so as to allow him to serve his sentence outside the prison but while still in the custody and under the control of the prison authorities. Another theory is that conditional liberty after conviction is in the nature of a contract, the terms of which include a provision for summary revocation. It is reasoned that the convicted person is free to accept or reject the "contract" but that once accepted, the terms are binding upon him. The third view is that the convicted person was afforded full constitutional protection at the trial at which he was convicted. Subsequent to conviction, his status is that of an escaped felon, and the constitutional guarantees given a person accused of crime do not extend to a later enforcement of punishment already validly imposed.

6. After being denied relief by the Iowa Supreme Court, petitioner Curtis sought a writ of habeas corpus on the same grounds in the United States District Court for the Southern District of Iowa, which was denied. The matter came before our court on petitioner's application for certificate of probable cause to appeal from that denial.

matter of statutory entitlement for persons qualified to receive them. Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are 'a privilege and not a right.'" Id. at 262, 90 S.Ct. at 1017. (Footnote omitted). The Supreme Court reasoned that the extent to which procedural due process must be afforded the recipient "depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication." Id. at 263, 90 S.Ct. at 1018. The *Hahn* court applied this same balancing test to conclude that the probationer's loss of freedom outweighed the added state burden of granting a hearing prior to revocation of his probation. In its opinion, the Seventh Circuit recognized that the Supreme Court in *Escoe v. Zerbst*, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed. 1566 (1935) had held that there is no constitutional right to a hearing on revocation of probation apart from any statute. However, the *Hahn* court interpreted this statement in *Escoe* as indicating "only that the [Supreme] Court's opinion was not based on a constitutional right to a hearing and not as a binding precedented rejection of such a constitutional right." Id., 430 F.2d at 105. The court entertained the view that the basis of the *Escoe* statement was the "privilege-right" distinction and that this has been undermined by recent Supreme Court decisions.[7]

With these considerations in mind, we are compelled to examine the test delineated by the Supreme Court in Goldberg v. Kelly, supra, 397 U.S. at 262–263, 90 S.Ct. 1011, which led the Seventh Circuit in *Hahn* to conclude that due process required that a hearing be held on revocation of *probation.* In explaining the analytical process for utilization of this

"balancing test," the Supreme Court in *Goldberg* held:

"Accordingly, as we said in Cafeteria & Restaurant Workers Union [Local 473, A.F.L.–C.I.O.] v. McElroy, 367 U.S. 886, 895, [81 S.Ct. 1743, 6 L.Ed. 2d 1230] (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' See also Hannah v. Larche, 363 U.S. 420, 440, 442 [80 S.Ct. 1502, 4 L.Ed.2d 1307] (1960)."

Id. at 263, 90 S.Ct. at 1018. The "precise nature of the government function" with which we are here concerned is the whole scheme of the granting of paroles to imprisoned convicts, as established by the Iowa statutes.

Parole relates to an administrative action taken after the convict has served a portion of his sentence behind prison walls. It is not a suspension of sentence, but "a substitution during the continuance of the parole, of a lower grade of punishment, by confinement in the legal custody and under the control of the warden within the specified prison bounds outside the prison, for the confinement within the prison adjudged by the court." Jenkins v. Madigan, 211 F. 2d 904, 906 (7th Cir.), cert. denied, 348 U.S. 842, 75 S.Ct. 63, 99 L.Ed. 664 (1954). The legal procedures providing for parole are a part of the legislative function of creating a penological system which encompasses, of course, rules to govern the care and discipline of inmates. Parole does not end or in any way affect a prisoner's sentence, but is a correctional device authorizing service of sentence outside the penitentiary. People ex rel. Abner v. Kinney, 30 Ill.2d 201, 195 N.E.2d 651, 653 (1964).

---

7. The Supreme Court decisions to which the court referred are Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600

(1969); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

In Rose v. Haskins, 388 F.2d 91 (6th Cir.), cert. denied, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968), on facts which closely parallel those before us, the court squarely held that "[a] state prisoner does not have a constitutional right to a hearing on a state parole revocation." Id. at 95. The petitioner in *Rose* was an Ohio prisoner whose parole was revoked without a hearing. The Ohio parole statutes, like those of Iowa, contained no provision for hearing on parole revocation, and the Supreme Court of Ohio, like the Supreme Court of Iowa, had held that there was no right to a hearing on revocation of parole. In re Varner, 166 Ohio St. 340, 142 N.E.2d 846 (1957). In concluding that the Ohio procedure for revocation of parole deprived the prisoner of no constitutional guarantees to which he was entitled, the court pointed out that the rights which the parolee claimed to be violated apply *prior to conviction* and not to a prisoner serving a sentence imposed upon a valid judgment. The court further reasoned that under Ohio law a parolee is in a position similar to that of a "trusty." The parolee and the trusty continue to serve their sentences even though they enjoy the privilege of leaving the confines of the prison walls. Both remain in the custody and under the control of the prison authorities. The court stressed that federal courts should be reluctant to interfere with state prison discipline, quoting with approval from United States ex rel. Lashbrook v. Sullivan, 55 F.Supp. 548, 550 (E.D.Ill.1944):

"In disposing of this contention, we are not called upon to review the record of any judicial proceeding. We are confronted merely with the question of whether the state administrative body, endowed by statute with discretion to determine whether a parole should be granted, may, after having once acted favorably, thereafter revoke the earlier order and deny parole. In the performance of their duties, such administrative officers are called upon to exercise judgment and discretion, to investigate, deliberate and decide.

People v. Joyce, 246 Ill. 124 and 135, 92 N.E. 607, 20 Ann.Cas. 472. The court's jurisdiction and duties ended when the judgment was entered; thereafter the execution of the sentence was within the sole authority of the executive department of the state. The manner of executing the sentence and extension or mitigation of punishment are fixed by the legislative department and what it has determined must be put in force and effect by the administrative or executive officers in whom the power is lodged. * * * The administration of the parole law is the exercise, through the administrative department, of the state's power to keep safely, supervise and discipline its prisoners. Such powers are not judicial but are matters of 'prison discipline.' "

Rose v. Haskins, supra, 388 F.2d at 96.

■ Our court is firmly committed to the principle that prison officials are vested with wide discretion in controlling persons committed to their custody. Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970); Courtney v. Bishop, 409 F.2d 1185 (8th Cir.), cert. denied, 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); Douglas v. Sigler, 386 F.2d 684 (8th Cir. 1967). Unless infringement of a paramount constitutional right is involved, as, for example, in the case of infliction of cruel and unusual punishment (Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968)), federal courts are loathe to interfere. Burns v. Swenson, supra; Courtney v. Bishop, supra.

■ It cannot be disputed that the state has a legitimate interest in deciding whether convicted felons should be granted parole. Broad discretion must be vested in a responsible body to enable it, in each individual case, to balance the need to protect the welfare and security of society with the desirability of placing a convicted person on parole in order to promote his rehabilitation and restoration to a useful life. The function of the parole board in weighing these countervailing factors when determining wheth-

er to grant parole was aptly described in Menechino v. Oswald, 430 F.2d 403, 407 (2d Cir. 1970):

> "It must make the broad determination of whether rehabilitation of the prisoner and the interests of society generally would best be served by permitting him to serve his sentence beyond the confines of prison walls rather than by being continued in physical confinement. In making that determination the Board is not restricted by rules of evidence or procedures developed for the purpose of determining legal or factual issues. It must consider many factors of a non-legal nature, such as psychiatric reports with respect to the prisoner, his mental and moral attitudes, his vocational education and training, the manner in which he has used his recreation time, his physical and emotional health, his intra-personal relations with prison staff and other inmates, his habits, and the nature and extent of community resources that will be available to him upon his release, including the environment to which he plans to return."

We are persuaded that the same types of non-legal, non-adversary considerations often prevail in the parole board's determination of whether a prisoner is a "good risk" for remaining outside the prison walls and in its decision to revoke a parole.

Moreover, we think that the function of the prison authorities and the parole board is not unlike that of the Federal Government as proprietor of a military installation, as discussed in Cafeteria & Restaurant Workers Union Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Both are charged with the management of their own internal affairs, and both have traditionally been allowed broad discretion in the handling of matters within their jurisdictions. In the *Cafeteria & Restaurant Workers Union* case the Supreme Court weighed this proprietary function of the Government with the private interest of an employee who was summarily excluded from the premises of a military installation for failure to meet security requirements, and concluded that the action taken, without a hearing and without advice as to the specific grounds for the exclusion, was not violative of the right to due process. Compare also Jay v. Boyd, 351 U.S. 345, 354, 76 S.Ct. 919, 100 L.Ed. 1242 (1956).

While we recognize the importance which the individual parolee attaches to being allowed to remain outside the prison walls while serving his sentence, we are not constrained to hold that his interest in obtaining a hearing on revocation of that privilege is sufficient to override the interest of the state and the prison authorities in effectively managing internal disciplinary and custodial affairs. As opposed to the welfare recipient in Goldberg v. Kelly, supra, the prisoner has no statutory right, even if "qualified," to be granted conditional liberty or allowed to remain on parole.

Moreover, if boards of parole were required to grant hearings, adversary in nature, with the full panoply of rights accorded in criminal proceedings, their function as an administrative body acting in the role of parens patriae would be aborted.[8] The probable result of the

8. In Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, 237, cert. denied, sub nom Thompson v. United States Board of Parole, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963), the court, sitting en banc, held that procedural due process was not required by the constitution in federal parole revocation proceedings, Judge (now Chief Justice) Burger described the function of a parole board:

"The Bureau of Prisons and the Parole Board operate from the basic premise that prisoners placed in their custody are to be rehabilitated and restored to useful lives as soon as in the Board's judgment that transition can be safely made. * * * Thus there is a genuine identity of interest if not purpose in the prisoner's desire to be released and the Board's policy to grant release as soon as possible. Here there is not the attitude of adverse, conflicting objectives as between the parolee and the Board inherent be-

imposition of such stringent requirements upon their method of operation would actually be to decrease the number of paroles granted due to the heavy burden placed upon the administrative processes of supervision and investigation.[9]

■■ In holding that a prisoner has no constitutional right to a hearing upon revocation of his parole, we emphasize, however, that the parolee cannot be made the subject of arbitrary action. As noted by the Iowa Supreme Court in Curtis v. Bennett, 256 Iowa 1164, 131 N.W.2d 1 (1964), cert. denied, 380 U.S. 958, 85 S. Ct. 1096, 13 L.Ed.2d 974 (1965), where the parolee alleges as basis for relief that he is not the party intended, that the revocation is a forgery, or that the officials attempting to revoke are without authority, the legality of his confinement may be inquired into by habeas corpus. Id. at 4.

■ Contending that Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) supports their position that the Due Process Clause of the Fourteenth Amendment requires a hearing on

revocation of parole,[10] appellants argue that revocation of parole is a stage in the criminal proceeding. We are not convinced that Mempa lends support to appellants' position, nor do we agree with the postulate upon which their contention rests.

In Mempa v. Rhay, supra at 130, 88 S.Ct. at 254, the Supreme Court at the outset of its opinion stated that "these consolidated cases raise the question of the extent of right to counsel *at the time of sentencing* where the sentencing has been deferred subject to probation." (Emphasis added). The Washington court had granted probation to the defendant upon his conviction, but, pursuant to the provisions of Wash.Rev.Code §§ 9.95.200, 9.95.210, had deferred actual imposition of sentence. Upon revocation of the defendant's probation, the trial judge imposed sentence. The Supreme Court did not question the authority of the state to defer sentencing and couple that proceeding with revocation of probation, but found that counsel must be afforded at this deferred sentencing stage of the proceeding. In so holding, the

tween prosecution and defense in a criminal case. Here we do not have pursuer and quarry but a relationship partaking of parens patriae. In a real sense the Parole Board in revoking parole occupies the role of parent withdrawing a privilege from an errant child not as punishment but for misuse of the privilege."

9. We do not view our decision as a categorical rejection of the holding in Hahn v. Burke, supra, that a probationer has a constitutional right to a hearing before revocation of his probation. The Seventh Circuit in *Hahn*, supra, 430 F.2d at 105, n. 5, specifically noted that it was not faced with the question of the constitutional right to a hearing upon revocation of *parole* and did not purport to decide that issue. Likewise, we do not pass upon whether there is a constitutional right to a hearing upon revocation of probation.

However, since appellants urge that for purposes of the applicability of procedural due process probation and parole should be treated alike, we deem it appropriate to delineate what we view as significant differences between the two.

Probation is the release of the defendant by judgment of the court before sentence has commenced. (Iowa Code § 247.20). It is judicial action taken before the prison door is closed and without the defendant ever being placed under the direct control of the prison authorities. The conditional liberty accorded on probation may be revoked or abrogated only by a subsequent judicial action, which by its normal function is amenable to the granting of notice and hearing. See McCoy v. Harris, 108 Utah 407, 160 P.2d 721, 723 (1945). Conversely, as the Iowa court noted in Curtis v. Bennett, 256 Iowa 1164, 131 N.W.2d 1, 3 (1964), cert. denied, 380 U.S. 958, 85 S.Ct. 1096, 13 L.Ed.2d 974 (1965), the parole board is not equipped to conduct hearings. The board has no power to issue subpoenas or swear witnesses, and does not purport to conduct proceedings of a judicial nature.

10. Appellants do not seek relief on the basis of denial of counsel but merely argue that the *Mempa* holding supports their contention of a right to a hearing as a requirement of due process.

Court reiterated the position taken in its earlier right-to-counsel decisions that "appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." Id. at 134, 88 S.Ct. at 257.

The core of *Mempa* is that because sentencing, whenever and however it takes place, is a stage in the criminal proceeding against an accused, the Sixth Amendment as applied through the Due Process Clause of the Fourteenth Amendment requires that the right to counsel be afforded at sentencing.

We cannot agree that revocation of parole is a stage of the criminal proceeding.[11]

"A criminal action is terminated by the final judgment entered upon a plea or verdict of guilty. Frad v. Kelly, 302 U.S. 312, 317, 58 S.Ct. 188, 82 L.Ed. 282. Final judgment means sentence, and sentence means final judgment. Miller v. Aderhold, 288 U.S. 206, 210, 53 S.Ct. 325, 77 L.Ed. 702; Hill v. United States ex rel. Wampler, 298 U.S. 460, 464, 56 S.Ct. 760, 80 L.Ed. 1283; Berman v. United States, 302 U.S. 211, 212, 58 S.Ct. 164, 82 L.Ed. 204; * * *"

Phillips v. United States, 212 F.2d 327, 335 (8th Cir. 1954). See also Richardson v. Markley, 339 F.2d 967, 969 (7th Cir.), cert. denied, 382 U.S. 851, 86 S.Ct. 100, 15 L.Ed.2d 90 (1965) and Hyser v. Reed, 115 U.S.App. 254, 318 F.2d 225, 238, cert. denied sub nom Thompson v. United States Board of Parole, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963), both holding that parole revocation is not a part of the criminal process.

Finally, we are moved to comment, as did the Sixth Circuit in Rose v. Haskins, supra, that if changes are to be made in

the prison disciplinary system of granting and revoking paroles, such matters should be altered at the legislative and not the judicial level. The legislature, and not the courts, are equipped not only to require changes in the administration of prison and parole management, but also to establish the machinery for the effectuation of such procedural alterations.

In our opinion, federal courts should not encroach into areas which have traditionally been matters of state concern. The operation of state penological systems, absent flagrant violations of constitutional guarantees, are within the domain of state interest. Williams v. Patterson, 389 F.2d 374 (10th Cir. 1968). Intrusions into this area by requiring the states to provide a hearing as a prerequisite to an effective revocation of parole, in all cases, and regardless of the circumstances, obviously would increase the business of already overburdened state and federal courts. Such interference would, in our considered judgment, also serve as a deterrent to the goal of fostering and improving harmonious state-federal relations. It would, in our opinion, be contrary to the basic principle of comity between the federal and state governments. Apropros here is the observation by the Supreme Court that this notion of comity is:

"a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways."

Younger v. Harris, 401 U.S. 37, 44, 91 S. Ct. 746, 27 L.Ed.2d 669 (1971).

11. Note that in Alverez v. Turner, 422 F.2d 214 (10th Cir.), cert. denied, McDorman v. Turner, 399 U.S. 916, 90 S.Ct. 2221, 26 L.Ed.2d 574 (1970), the court reiterated its earlier position that *Mempa* is not applicable to parole revocation proceedings which are not a part of the sentencing process. Id. at 218. However,

in this same case, the court afforded relief to one of the appellees who claimed he had been denied assistance of counsel in the *judicial* proceedings that had resulted in the revocation of his *probation*. The court held that this denial was a clear abuse of a federal constitutional right. Id. at 220–221.

In holding that the Due Process Clause of the Fourteenth Amendment does not require that a hearing be granted on revocation of parole, we note that our decision conforms with those of the various federal courts of appeal which have held that certain procedural safeguards do not extend to parole proceedings as a requirement of constitutional due process. Allen v. Perini, 424 F.2d 134 (6th Cir.), cert. denied, 400 U.S. 906, 91 S.Ct. 147, 27 L.Ed.2d 143 (1970); Rose v. Haskins, supra; Eason v. Dickson, 390 F.2d 585 (9th Cir.), cert. denied, 392 U.S. 914, 88 S.Ct. 2076, 20 L.Ed.2d 1373 (1968); Williams v. Dunbar, 377 F.2d 505 (9th Cir.); cert. denied, 389 U.S. 866, 88 S.Ct. 131, 19 L.Ed.2d 137 (1967); Hyser v. Reed, supra; Richardson v. Markley, supra; Johnson v. Tinsley, 234 F.Supp. 866 (D.Colo.), aff'd 337 F.2d 856 (10th Cir. 1964). Cf. Douglas v. Sigler, supra; Mead v. California Adult Authority, 415 F.2d 767 (9th Cir. 1969); Earnest v. Willingham, 406 F.2d 681 (10th Cir. 1969).

Finally, we recognize that the Supreme Court has on several occasions declined the opportunity to pass upon this issue. As recently as November 9, 1970, certiorari was denied in Allen v. Perini, supra, in which the Sixth Circuit reaffirmed the position taken in Rose v. Haskins, supra, which is directly contrary to the contentions which appellants have presented to our court.

For all of the foregoing reasons, the orders of the district court are affirmed.

Our mandate shall issue forthwith.

LAY, Circuit Judge, with whom HEANEY and BRIGHT, Circuit Judges, concur, dissenting:

The Fourteenth Amendment to the Constitution of the United States reads in part "Nor shall any State deprive any person of life, liberty, or property, without due process of law." This clause is unambiguous on its face. Its plain meaning requires notice of the charges or an opportunity to be heard before a state may deprive the liberty of any person.

Under Iowa law a parolee may be arrested, without notice of the fact that he will be returned to prison, without notice as to why he is being returned to prison, and without an opportunity to be heard in defense of the charge. The state's hypothesis is that due process is not required in the setting of parole revocation. A literal reading of the Constitution makes this postulate difficult to understand. A parolee is a "person" within the meaning of the due process clause. It is the "state" which revokes the parole status. Therefore, the only words which could possibly exempt the parolee from the operation of the Fourteenth Amendment are "deprive" and "liberty." These are not complex words with ambiguous meanings. It is true that a parolee lives in society with more restrictions than other citizens, that his is a "conditional" liberty. However, in a sense every person's liberty is conditional on abiding by the rules of law. To reason that a parolee who is returned to the gray perimeter of prison walls is not "deprived" of "liberty," approaches the realm of judicial sophistry.

Such provincial and stunted rationalizations cannot square with words of the Constitution. Since logic and justice do not mandate the denial of due process to a parolee I am able to assess its denial in only one light. The denial of due process in parole revocation simply mirrors society's overall attitude of degradation and defilement of a convicted felon.[1] It is sad 20th Century Commentary that

---

1. Denial of due process in the parole revocation of a parolee falls far short of the ideals expressed in the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 83 (1967):

"A first tenet of our governmental, religious, and ethical tradition is the intrinsic worth of every individual, no matter how degenerate. It is a radical departure from that tradition to subject a defined class of persons, even criminals, to a regime in which their right to liberty is determined by officials wholly unaccountable in the exercise of their power. * * *"

society views the convicted felon as a social outcast. He has done wrong, so we rationalize and condone punishment in various forms. We express a desire for rehabilitation of the individual, while simultaneously we do everything to prevent it. Society cares little for the conditions which a prisoner must suffer while in prison;[2] it cares even less for his future when he is released from prison.[3] He is a marked man. We tell him to return to the norm of behavior, yet we brand him as virtually unemployable; he is required to live with his normal activities severely restricted[4] and we react with sickened wonder and disgust when he returns to a life of crime.

If social values and goals be germane to the legal issue, the state sustains no valid governmental policy in such treatment. The cliche that "society breeds crime" is not irrelevant to the discussion. But the judiciary can only be interested in social values which are compatible within the requirements of the Constitution. And there should be little doubt that the Constitution clearly prohibits the summary imprisonment of any man without due process of law. Justice Harlan recently wrote for the Supreme Court in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971):

"Early in our jurisprudence, this Court voiced the doctrine that '[w]herever one is assailed in his person or his property, there he may defend,' Windsor v. McVeigh, 93 U.S. 274, 277, [23 L.Ed. 914] (1876). See Baldwin v. Hale, 1 Wall. 223 [17 L.Ed. 531 (1863); Hovey v. Elliott, 167 U.S. 409 [17 S.Ct. 841, 42 L.Ed. 215] (1897). The theme that 'due process of law signifies a right to be heard in one's defence,' Hovey v. Elliott, supra, at 417 [17 S.Ct. 841], has continually recurred in the years since Baldwin, Windsor, and Hovey. Although '[m]any controversies have raged about the cryptic and abstract words of the Due Process Clause,' as Mr. Justice Jackson wrote for the Court in Mullane v. Central Hanover [Bank &] Trust Co., 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865] (1950), 'there can be no doubt that at a minimum they require that deprivation of life, liberty, or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.' Id., at 313, 70 S.Ct. 652."

The very minimum standard of due process requires notice to the parolee of the reason for the revocation of his parole and an opportunity for him to be heard in resistance of the revocation. Cf. Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).[5] We recently said:

"Every citizen * * * is entitled to be substantively informed as to any

---

2. Cf. Governor Scott, "The Bar that Improves the 'Bars': A Plea for Prison Reform in North Carolina," Judicature, March 1971 p. 320; see also Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970), 442 F.2d 304 (8th Cir. 1971).

3. A recent cover story in Time Magazine on the unhappy state of our correctional system pointed out: "Even though two-thirds of all offenders are on parole or probation, they get the least attention: 80% of the U. S. correctional budget goes to jails and prisons * * * Only about 20% of the country's correctors work at rehabilitation * * *" Time Magazine, Jan. 18, 1971, "The Shame of the Prisons" p. 53.

4. See Dawson, Sentencing: The Decision as to Type, Length, and Conditions of Sentence, The Report of the American Bar Foundation's Survey of the Administration of Criminal Justice in the United States, p. 367 (1969) [hereinafter cited as Sentencing]:

"The primary purpose of parole conditions is to maximize the parole officer's control over the parolee's behavior. As a result, parole conditions tend to be numerous and to touch upon many aspects of the parolee's life, some of which are only remotely related to the causes of his criminality. The violation of many of these conditions usually does not indicate a failure of the parolee to adjust to community life or an imminent danger to society, but indicates instead a normal pattern of behavior well within that expected of usually law-abiding persons."

5. The minimal requirements of notice of the charge and an opportunity to be heard

governmental action which may affect his liberty or life. No governmental procedure may stand which fails to provide such information. To be both fairly and timely advised is fundamental to the basic concepts of due process. 'Clandestine due process' has never found favor or constitutional basis in courts of law. As this court said in United States v. Owen, 415 F. 2d 383 (8 Cir. 1969): 'Inherent in the most narrow view of due process is the right to know of adverse evidence and the opportunity to rebut its validity and relevance. Chernekoff v. United States, (9 Cir. 1955) 219 F.2d 721.' Id. at 388.'' United States v. Cummins, 425 F.2d 646, 649, (8 Cir. 1970).

Accord, Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955); Simmons v. United States, 348 U.S. 397, 75 S.Ct. 397, 99 L.Ed. 453 (1955); Sicurella v. United States, 348 U.S. 385, 75 S.Ct. 403, 99 L.Ed. 436 (1955); United States v. Nugent, 346 U.S. 1, 73 S.Ct. 991, 97 L.Ed. 1417 (1953); cf. Oestereich v. Selective Service System Local Bd., 393 U.S. 233, 243 n. 6, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968) (Harlan, J., concurring). Recent decisions have found a denial of due process to state prisoners whose paroles had been revoked without notice or an opportunity to be heard with counsel. See Murray v. Page, 429 F.2d 1359 (10 Cir. 1970); Goolsby v. Gagnon, 322 F.Supp. 460 (E. D. Wisc., 1971); Hester v. Craven, 322 F.Supp. 1256 (C.D. Cal., 1971); People

ex rel. Menechino v. Warden, 27 N.Y.2d 376, 318 N.Y.S.2d 449, 267 N.E.2d 238 (1971). Cf. Menechino v. Oswald, 430 F.2d 403 (2 Cir. 1970) and Sostre v. McGinnis, 442 F.2d 178 (2 Cir., 1971) (Part VI).

These decisions have relied strongly on the reasoning of Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), where the Court held that due process is required in probation revocation proceedings on deferred sentencing. The Seventh Circuit, in a distinguished court composed of Mr. Justice Clark, Retired, and Judges Cummings and Kerner, recently held that due process is required on revocation of probation proceedings without regard to whether the sentence was deferred. Hahn v. Burke, 430 F.2d 100 (7 Cir. 1970). The Fourth Circuit has also applied the principle of Mempa to probation revocation. Hewett v. North Carolina, 415 F.2d 1316 (4 Cir. 1969). The reasoning of these cases is controlling here. As the majority indicates, however, some courts have denied the claim of constitutional infringement. Most courts which so held rendered their opinion prior to the Supreme Court's decision in *Mempa*. Analysis of those decisions, and the majority opinion, demonstrates their reliance on traditional arguments which have been largely undermined by recent decisions.

## RIGHT/PRIVILEGE DOCTRINE

It is argued that the granting of parole is a matter of grace which is strictly in the discretion of the parole board, so that

---

provide the safeguard to abuse of revocation. Studies have shown that many paroles have been revoked on recommendations of parole officers because of the parolee's *alleged* involvement in a new crime. Rather than take the time, the expense and the possibility that the parolee may be found innocent of the new crime, the parolee is shunted back to prison for a technical reason. See *Sentencing*, supra, p. 362.

As observed in a recent article in *Time* Magazine, supra, p. 53:

"Even parole supervision is often cursory and capricious. Many parole agents handle more than 100 cases;

one 15-minute interview per man per month is typical. The agents can also rule a parolee's entire life, even forbid him to see or marry his girl, all on pain of reimprisonment—a usually unappealable decision made by parole agents, who thus have a rarely examined effect on the repeater rate. To test their judgment, Criminologists James Robison and Paul Takagi once admitted ten typothetical parole-violator cases to 316 agents in California. Only five voted to reimprison all ten men; half wanted to return some men but disagreed on which ones."

the parolee is not prejudiced as to any *right* upon revocation. While there may not be a "right" to parole or any other discretionary "privilege" in the first instance, see Menechino v. Oswald, supra, once the discretion is exercised and the privilege granted the entitlement cannot be divested in a manner inconsistent with the requirements of due process. See Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). As the Supreme Court pointed out in Goldberg, there are situations in which the governmental interest involved outweighs the private interest. However, these situations usually involve an emergency in which the danger to the public health or safety is imminent.[6]

In the context of probation revocation, the Fourth Circuit has refuted the right/privilege distinction:

"We are not impressed by the argument that probation as a 'mere' privilege, or a matter of grace, rather than a right and that, therefore, various constitutional mandates, including the right to counsel, should be held to be inapplicable. Even if a distinction exists between the components of the right-privilege dichotomy, when a state undertakes to institute proceedings for the disposition of those accused of crime it must do so consistently with constitutional privileges, even though the actual institution of the procedure was not constitutionally required. See, e. g., Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (plurality opinion)." Hewett v. North Carolina, 415 F.2d at 1322–1323.

In his dissenting opinion in Rose v. Haskins, 388 F.2d 91, 97, 100–101 (6 Cir. 1968), Judge Celebrezze points out the weakness of the right/privilege distinction:

"In Fleenor v. Hammond, 116 F.2d 982 (6th Cir. 1941), supra, this Court granted that pardon was a matter of grace but pointed out that once pardoned the person pardoned was entitled to his liberty: a liberty that could be forfeited only by his breach of the conditions of the pardon. As indicated above, the act-of-grace assumption need not be so summarily granted, but, even if the liberty given the parolee is considered a privilege, the *Fleenor* decision is more commensurate with the protection given other so-called privileges by recent Supreme Court decisions. Cf. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)." [7]

---

6. See R. O'Neil, "Of Justice Delayed And Justice Denied: The Welfare Prior Hearing Cases," 1970 Supreme Court Review 161, 169:
"There have been instances, as the majority opinion noted, in which a constitutional right to be heard has been postponed until after the completion of the contested action. *But the circumstances justifying deferral of a conceded right to notice, personal appearance, and confrontation, are highly unusual. There are the classic 'emergency' cases*—food is about to spoil and must be kept from grocers' shelves; a fraud is about to be perpetrated on unsuspecting securities purchasers; or a professional licensee is continuing to offer his services to trusting clients after having perpetrated malpractice. *In these situations, the reason for acting now and hearing later are incontestable. Moreover, there is usually an adequate remedy after the fact; if the victim of summary action later prevails,* he can be made whole or nearly whole *through money damages.*
"*Apart from these emergency situations, there seems almost a general presumption that one who is constitutionally entitled to be heard at all should be heard before the change in status occurs.*" (Emphasis ours.)
Mr. O'Neil further comments:
"These distinctions revive the specter of the long-interred right-privilege dichotomy. For some years the Supreme Court has deliberately avoided these labels and their irrational effects." *Id.* at 179.

7. Judge Celebrezze thoroughly summarizes the law in this area and then points out:
"In this country most interests of a citizen are protected from direct government action that does not conform to due process of law. Of course, due process has a flexible context; what process is due a person in one situation may not be due him in another, and a

See also State ex rel. Menechino v. Warden, supra.[8]

## BALANCING OF INTERESTS

In Goldberg v. Kelly, supra, the Supreme Court said:

"The extent to which procedural due process must be afforded the recipient [of governmental gratuity] is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugees Committee v. McGrath, 341 U.S. 123, 168 [71 S. Ct. 624, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in Cafeteria & Restaurant Workers Union [Local 473, A.F.L.–C.I.O.] v. McElroy, 367 U.S. 886, 895, [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by governmental action.' See also Hannah v. Larche, 363 U.S. 420, 440, 442, [80 S.Ct. 1502, 4 L.Ed.2d 1307] (1960)." 397 U.S. at 262–263, 90 S.Ct. at 1018.[9]

cynic might say that if due process has no effect it does not apply. But to say that an interest is a privilege; therefore, constitutional rights do not attach only obscures the reasoning by which a decision is reached that due process considerations must yield to policies of countervailing importance. The method of reaching such a decision was indicated in *Cafeteria:*

'As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' 367 U.S. at 895, 81 S.Ct. at 1748.

"The 'precise nature of the government function' involved in the revocation of a parole is the determination of an adjudicatory fact: Has the parolee or has he not violated the conditions of his parole? The difficulty arises because all of the functions of administering a parole system are the responsibility of the same agency, which grants parole, supervises parole, and revokes parole. Many of the functions involve a certain amount of expertise in the application of principles of behaviorial and sociological sciences, and some fears have been expressed that judicial interference in one function will disrupt the whole scheme.

"For the most part those fears have been supported by nothing more than the untutored intuition of the person expressing them; so they should be closely scrutinized in order to determine their validity." 388 F.2d at 101.

8. Professor Davis, 1 Administrative Law Treatise § 7.11, p. 455 (1958), observes that "the courts are increasingly recognizing that the use of the privilege doctrine is often unsound." He further points out:

"But if a right is an interest which is legally protected, and if a court gives legal protection to a privilege, does not the court turn the privilege into a right? Even if the answer to this question is yes, the proposition may still be perfectly sound that one who lacks a 'right' to a government gratuity may nevertheless have a 'right' to fair treatment in the distribution of the gratuity. In tort law, the accident victim has no right to be helped by the passerby, but he has a right to careful and proper treatment by the passerby who volunteers to help. Like the passerby, the government may refuse altogether to help applicants for gratuities, but it cannot provide the help improperly; it cannot grant or withhold on the basis of racial or religious discrimination. The government could deny altogether the admission of Oklahoma to the Union, but it could not admit Oklahoma improperly, that is, with a condition that its capital must be at a particular place. A state can deny altogether a permit to a foreign corporation to do local business, but it cannot grant the privilege improperly, that is, on condition that suits against the corporation shall not be removed to a federal court." § 7.12, p. 456.

See also Note, "Re-Arrest of Parolees: Constitutional Considerations," 46 Wash. L.Rev. 175, 178 (1970).

9. In Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959), the Court observed:

"Certain principles have remained relatively immutable in our jurisprudence.

The majority opinion argues that the government's interest in summary revocation outweighs the parolee's interest in procedural rights, because: (1) the full panoply of criminal rights would overburden the administrative hearing process; (2) a hearing would interfere with the *parens patriae* relationship and thereby inhibit rehabilitation; (3) the prospect of full trials upon revocation will deter parole boards from granting paroles in the first instance.

1. The majority expresses concern that "the full panoply of criminal rights" will unduly tax the administrative process. Neither the petitioners nor any of the authorities that recognize procedural due process have argued that a parolee is entitled to the "full panoply" of rights. Fact-finding processes can be flexible without being basically unfair. An adequate system can be developed which is something less than a full trial. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). And see *Davis, supra,* § 7.16, pp. 179–180 (1965 Supp.). The new Washington state procedure, for example, provides that a parolee accused of a violation must be served with the charges of the violation and shall be advised of his right to an on-site revocation hearing (which he may waive). Wash.Rev.Code Ann. §§ 9.95.120 et seq. (1969–70 Supp.). There is no indication that states which have adopted hearings for parole revocation have experienced significant difficulties.[10] What little data is available does not justify alarm as to the effect of due process on revocation proceedings.[11] Experience in states which provide for parole revocation hearings and permit the parolee to retain counsel indicates that fears of havoc and ruin are exaggerated, if not unwarranted.[12] Further, there is no indication that the right of federal parolees to a hearing upon revocation, 18 U.S.C.A. § 4207, has in any way diminished the efficiency of the federal parole board. Professor Kadish has made an incisive observation in this regard:

"The problems of overburdened parole boards would appear remediable by measures directed to the problem rather than by the pursuit of measures which render the work of the boards

One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots."

10. See S. Rubin, "Developments in Correctional Laws," Crime and Delinquency 185 (April 1970).

11. See generally, B. Jacob and K. Sharma, "Justice After Trial: Prisoners' Need for Legal Services in the Criminal-Correctional Process," 18 Kan.L.Rev. 493, 540–550 (1970); R. Sklar, "Law and Practice in Probation and Parole Revocation Hearings," 55 J.Crim.Law 175, 197 (1964); S. Kadish, "The Advocate and the Expert—Counsel in the Peno-Correctional Process," 45 Minn.L.Rev. 803, 832–841 (1961).

12. The majority's conclusory apprehension is not supported by a study of the parole revocation system in Michigan which revealed:

"The number of parolees returned to prison as technical violators who elect to have a public hearing has been small since the law providing for such hearings was passed in 1937. Typically, five or six such hearings are held each year. The largest number of hearings held in a single year has been ten. The small number of public hearings is partially due to the care taken by parole officers in ascertaining the facts of a violation and their practice of refraining from initiating revocation procedures if the facts do not support the action. Most parolees brought before the board on charges of technical violations are quick to plead guilty to the counts cited against them." *Sentencing, supra,* at 355.

less just and less adequate." 45 Minn. L.Rev. at 837–838.

2. I would have thought that In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (1967), closed the door to the *parens patriae* argument.[13] It is a fiction to view the parole board and the parolee as having an identity of interest.[14] The majority refers to the detrimental effect due process would have on rehabilitation. However, there is no concrete evidence to substantiate this assertion, just as the evidence does not indicate that the present system is particularly effective in rehabilitating parole violators. If the *absence* of due process has any effect on rehabilitation, however, it is most likely to be detrimental. Arbitrary action by officers of the law is more likely to breed resentment and disrespect than rehabilitation. The New York Court of Appeals recognized the cogency of the argument:

"[T]he parole system is an enlightened effort on the part of society to rehabilitate convicted criminals. Although few circumstances could better further that purpose than a belief on the part of such offenders in a fair and objective parole procedure, hardly anything could more seriously impede progress toward that important goal than a belief on their part that the law's machinery is arbitrary, too busy or impervious to the facts. The desired end can become a reality only by requiring obedience to the demands of

---

13. *Gault* addresses itself to the *parens patriae* argument in the context of juvenile delinquency hearings:

"These results [rehabilitation] were to be achieved, without coming to conceptual and constitutional grief, by insisting that the proceedings were not adversary, but that the state was proceeding as *parens patriae*. The Latin phrase proved to be a great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; *but its meaning is murky and its historic credentials are of dubious relevance*. The phrase was taken from chancery practice, where, however, it was used to describe the power of the state to act *in loco parentis* for the purpose of protecting the property interests and the person of the child. *But there is no trace of the doctrine in the history of criminal jurisprudence*." 387 U.S. at 16, 87 S.Ct. at 1437. (Emphasis ours.)

The Court went on to point out that "proceedings involving juveniles were described as 'civil' not 'criminal' and therefore not subject to the requirements which restrict the state when it seeks to deprive a person of his liberty. * * * The constitutional and theoretical basis for this peculiar system is—to say the least—debatable." *Id.* at 17, 87 S.Ct. at 1438. "Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy." *Id.* at 19–20, 87 S.Ct. at 1438. The parallel to parole revocation procedures is obvious.

14. Professor Davis topically refutes the contention that the parole board and the parolee have an identity of interest which is interrupted by judicial procedural safeguards. In discussing Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225 (1963), cert. denied 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963), he says:

"The reasons for rejecting these various arguments of the majority are persuasive. The court's assertion that the prisoner and the Board have a 'genuine identity of interest' may have some plausibility concerning the Board's exercise of discretion after the Board has found the facts, but it has no reality at the point when the Board is finding facts that the prisoner is specifically denying; at that crucial point the interests are obviously opposed, not identical. Even if the Board 'occupies the role of parent withdrawing a privilege,' one may wonder whether a parent (or the Board) is acting justly by unnecessarily denying the child (or the parolee) a chance to explain or rebut the evidence against him. If the Board does not 'adjudicate' when it finds facts from conflicting evidence, then the term 'adjudicate' has lost its usual meaning. The theory that parole is a part of 're-habilitation' is a theory that may have promise for the future, but it is not the only theory that governs the thought and action of parole officers. One has only to interview members of the Federal Parole Board to learn that ideas of deterrence and retribution still have great force." Davis, supra, § 7.16, p. 175 (1965 Supp.)

due process and granting parolees a hearing at which they will be represented by counsel." State ex rel. Menechino v. Warden, 267 N.E.2d 238, 243–44 (1971).[15]

The point is that in *correctional* penology there is no arbitrary right to revoke parole. In effect, society tells the parolee that he may remain at liberty if he stays out of trouble. If the parolee does abide by the rules and his parole is revoked, without notice of the reasons or an opportunity to be heard, his resulting attitude of resentment and betrayal is not likely to improve his outlook on society and its rules. Arbitrary revocation can actually put a negative incentive on cooperating with his parole officer.

3. It is further argued that if due process is required at revocation proceedings there will be fewer paroles granted which will retard rehabilitation in the larger sense. The district court for the Eastern District of Wisconsin recently rejected this argument as unwarranted speculation and mere assertion since the "state has not shown in precisely what manner the burden of a hearing prior to revocation would lead to fewer paroles." Goolsby v. Gagnon, 322 F.Supp. 460 (E.D.Wisc. 1971). In ad-

dition, this contention casts unwarranted aspersions on the dedication of parole boards. It assumes that parole board members would react vindictively to spite the legal process. It assumes that parole boards would deny paroles to otherwise deserving prisoners and thereby delay their optimum rehabilitation merely to save themselves a little time.[16]

On balance, it appears that there is no really substantial state interest in summary adjudication other than that of preserving the status quo. The individual's interest in maintaining his liberty, however restricted, his interest in maintaining whatever reputation he might have regained in the community, his interest in avoiding sudden and possibly disasterous interruptions in his home life and in his employment, coupled with society's interest in rehabilitating ex-convicts rather than embittering them through arbitrary and unfair treatment, all outweigh the state's minimal interest in summary adjudication.

## PROBATION/PAROLE DISTINCTION

The principle of Mempa v. Rhay, Hahn v. Burke, and Hewett v. North Carolina, supra, providing that there is a right to due process at probation revocation pro-

15. The dissent in the state decision of *Mempa*, which position was ultimately adopted by the Supreme Court, also underlines this fact:
  "In fairness to any probationer, the procedures utilized should be designed to avoid the possibility, however remote, of revocations founded on accusations arising out of mistake, prejudice and caprice. The threat of arbitrary or whimsical commitment does not tend to encourage either cooperation or successful rehabilitation. Reformation can best be accomplished by fair, consistent, and straightforward treatment of the individual." Mempa v. Rhay, 68 Wash. 2d 882, 416 P.2d 104, 114 (1966) (Hamilton, J. dissenting).
  See also Note, "Re-Arrest of Parolees: Constitutional Considerations," 46 Wash. L.Rev. 175, 179 (1970); Comment, "Due Process and Revocation of Conditional Liberty," 12 Wayne L.Rev. 638, 650 (1966).

16. Practical considerations might further indicate that the predicted result of fewer paroles will not come to pass. The sheer weight of numbers might prevent any radical departure from the present level of paroles granted. With prisons grossly overcrowded and understaffed for proper correction and rehabilitation, it seems unlikely that a parole board would want to, or could if it wanted to, cease granting paroles and add to the logjam merely to serve their administrative convenience. Indeed, one commentator has noted that aside from rehabilitation, the primary purpose of parole is probably economics. Parole boards are often concerned with overcrowded prisons and the cost of feeding and clothing prisoners. Therefore, if a prisoner has met the minimum requirements and the chance for recidivism is not high, he will probably be released on parole. These financial considerations might also explain why parole violators are often reparoled. Comment, supra, 12 Wayne L.Rev. at 640.

ceedings, is clearly applicable to parole revocations also:

"The principle which underlies the decision in *Mempa* is sufficiently broad to encompass the revocation of parole as well as of probation. In both, the decision to deprive an individual of his liberty turns on factual determinations, and we would say, as did the Supreme Court in the *Mempa* case (389 U.S., at p. 135 [88 S.Ct. 254, 19 L.Ed. 2d 336]), that 'the necessity for the aid of counsel in marshaling the facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case * * * is apparent.'" People ex rel. Menechino v. Warden, 27 N.Y. 2d 376, 318 N.Y.S.2d 449, 267 N.E. 2d 238 (1971).

In Warren v. Michigan Parole Board, 23 Mich.App. 754, 179 N.W.2d 664, 670 n. 22 (1970), the court observed:

"We are mindful of the peculiar status of the paroled prisoner. Technically he occupies a different place in the law than the probationer * * * Yet when the parolee and the probationer are accused of violations of their conditional status, the differences between them assume insignificant proportions.

"Of paramount concern to both of them is the impending loss of their liberty. It simply is not reasonable to suggest that in the face of this common threat to a constitutionally protected interest—liberty—the parolee should be denied procedural safeguards now freely available to the probationer.

\* \* \*

"This correspondence [discretion of trial court to determine minimum sentence and discretion of parole board to determine length of parole] serves to emphasize the incongruity of refusing to apply to parole revocation procedures the constitutional guarantees which accompany deferred sentencing."

In Commonwealth v. Tinson, 433 Pa. 328, 249 A.2d 549 (1969), the Pennsylvania Supreme Court held that after Mempa v. Rhay, supra, to distinguish probation and parole "is completely untenable." [17]

## CONSTRUCTIVE CUSTODY THEORY

It is urged that a parolee is still in the constructive custody of prison authorities even though not in their physical custody. In effect, it is said parole is an extension of the prison walls and therefore,

17. Both parole and probation "provide for the return of a convicted criminal to society under limited conditions, with failure to conform to such conditions resulting in a loss of the conditional liberty status and reincarceration." Comment, supra, 12 Wayne L.Rev. at 639. Mr. Sol Rubin, Counsel for the National Council on Crime and Delinquency, has also pointed to the similarities. "In fact, the status of the probationer and parolee are in the strongest correspondence—in the granting of the status, being dependent on the discretion of judge or board; in the nature of the conditions of release (more or less —or exactly—identical) ; in the process of revocation; and even in the decision as to what their continued status will be, whether continued conditional release or incarceration." S. Rubin, "Due Process Is Required in Parole Revocation Proceedings," June 1963 Federal Probation 42, at 45.

See also Goolsby v. Gagnon, 322 F. Supp. 460 (E.D.Wisc., 1971), where Judge Reynolds followed the rationale of Hahn v. Burke, supra, and held that there is a constitutional right to due process in a state parole revocation hearing, including the right to a hearing on the factual basis of the revocation and the right to the assistance of counsel. The court held: "The central fact, which applies to both probation and parole revocations, is that revocation is the event which operates to deprive a man of his liberty. * * * Hence, I find no substantial degree of difference between the 'grievous loss' to be suffered by a probationer facing revocation and a parolee facing revocation which would dictate reaching a different result with regard to the requirement of a hearing." 322 F.Supp. at 463.

judicial involvement in parole revocation proceedings is an unwarranted interference with "prison discipline."

This proposition seems to be based on the assumption that an incarcerated prisoner has no rights. However, it is settled that prison officials may not interfere with a prisoner's basic constitutional rights. See e. g. Cooper v. Pate, 378 U. S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964). Prison discipline may not impair a prisoner's access to the courts. See Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Ex parte Hull, 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). In the recent Second Circuit opinion of Sostre v. McGinnis, 442 F.2d 178, 198 (2 Cir. 1971), Judge Kaufman observed:

"In thus rejecting Judge Motley's conclusions, however, we are not to be understood as disapproving the judgment of many courts that our constitutional scheme does not contemplate that society may commit lawbreakers to the capricious and arbitrary actions of prison officials. *If substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined.* This is not a concept without meaning. *In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him,* see Armstrong v. Manzo, 380 U.S. 545, 552 [85 S.Ct. 1187, 14 L.Ed.2d 62] (1965); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865] (1950), *and afforded a reasonable opportunity to explain his actions.*" (Emphasis ours.)

Judge Blackmun (now Mr. Justice Blackmun) thoroughly pointed out the traditional position of the Eighth Circuit in Jackson v. Bishop, 404 F.2d 571 (8 Cir. 1968). This court's position has been that while it is reluctant to interfere with a prison's internal discipline, "a prisoner of the state does not lose all his civil rights during and because of his incarceration. In particular, he continues to be protected by the due process and equal protection clauses which follow him through the prison doors." *Id.* at 576. See also Meola v. Fitzpatrick, 322 F.Supp. 878 (D.Mass., 1971), holding that a state violated the prisoner's Fourteenth Amendment rights by imposing prison disciplinary measures which substantially affected his interests (forfeiture of earned good time) so that he was entitled to procedural safeguards, *"at least the elementary ones of notice of the charges against him and an opportunity to reply to them."* (Emphasis ours.) Accord, Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y. 1970).[18]

---

18. Aside from the error of the unstated premise of the majority's theory of constructive custody, the commentators have amply illustrated the fictional basis of the theory of the "extension of the prison walls."

"Equating actual and constructive custody seems unrealistic. While the parolee is inhibited somewhat by the conditions of his parole, which commonly include restrictions on association and travel, it cannot be seriously contended that these restrictions are comparable to the restrictions imposed upon an actual prisoner." Note, supra, 46 Wash.L.Rev. at 176–177.

Another observer argues that the custody theory is an attempt to attach unconstitutional conditions to the grant of a privilege. W. White, "The Fourth Amendment Rights of Parolees and Probationers," 31 U.Pitt.L.Rev. 167, 178–181 (1969). Deeming the constructive custody theory "at most an embellishment that should not be dispositive of the constitutional questions," another writer has pointed out:

"This theory is dependent upon the fiction that conditional liberty does not liberate the prisoner but merely 'pushes back the prison walls' * * *. This fiction, however, is not a satisfactory basis for negating the applicability of constitutional rights. It is obvious that as inhibited as the parolee may be, there is no comparison between the freedom he enjoys while on parole and imprisonment. Thus, the metaphorical

Mr. Justice Jackson, dissenting in United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L. Ed. 317 (1950), observed:

"Security is like liberty in that many are the crimes committed in its name. * * * The plea that evidence of guilt must be secret is abhorrent to free men, because it provides a cloak for the malevolent, the misinformed, the meddlesome, and the corrupt to play the role of the informer undetected and uncorrected." *Id.* at 551, 70 S.Ct. at 317.

Even an *alien* who has become a lawful resident of the United States cannot be deprived of due process of law, and though he may be subject to expulsion he is entitled to notice of the nature of the charge and a hearing at least before an executive or administrative tribunal. Kwong Hai Chew v. Colding, 344 U.S. 590, 596–597, 73 S.Ct. 472, 97 L.Ed. 576 (1953); Japanese Immigrant Case, 189 U.S. 86, 100–101, 23 S.Ct. 611, 47 L.Ed. 721 (1903). See also Davis, supra, § 7.15.

## CONTRACT THEORY

It is argued that parole is in the nature of a contract to which the parolee is a party. By having agreed to the terms of the parole, the parolee is in no position to complain about the lack of process in revocation. Any comparison with contract law is unrealistic. The "parties" are nowhere equal in bargaining strength and the parolee cannot object to provisions he thinks are unreasonable. The parole agreement is presented on a take it or leave it basis, and to a prisoner with the prospect of obtaining his freedom there is no reasonable choice. Courts reject such rationalizations when dealing with adhesive contracts in insurance law [19] and in equating the relationship of the consumer with the manufacturer in the field of product liability.[20] It is a strange anomaly to fictionalize its use when dealing with an individual's personal liberty.

Judge Celebrezze's dissent in Rose v. Haskins, supra, further points up the fallacy of the contract argument. He points out the erroneous historical basis for the argument and how these matters are determined by the public demand rather than the consent of the prisoner.

"So a parole is not a 'contract' in the traditional sense of that word, and, if the theory only means that the State in fact attached such a condition to the parolee's freedom, the question remains whether the State can attach such a condition. For if the negative pregnant that is implicit in the contract theory is true (that if the parolee had not agreed to summary revocation he would have had the right to a hearing), then that theory has recognized that a right to a hearing is inherent in the revocation situation. Waiver of such a valuable right is not to be lightly determined, and when the 'choice' of the parolee is to remain in prison or accept such a burdensome provision, the 'choice' to accept parole can hardly be termed a voluntary waiver of the right to a hearing. Therefore, the two legal theories advanced to justify the denial of a hearing have

*extension of prison walls-constructive custody theory* is an insufficient basis, by itself, for holding that conditional liberty is not circumscribed by constitutional protections. This theory like the contract theory is generally discussed after the court has made the right-privilege distinction and reached a 'no procedural due process' conclusion." Comment, supra, 12 Wayne L.Rev. at 646. The author further argues that if the constructive custody theory is to be applied with logical consistency, then since the parolee is still technically in prison

he *must* be given credit for parole time against his sentence, and yet this is not the case in practice. *Id.* at 647. Mr. Sol Rubin has also argued that abandoning the fiction of constructive custody would make parole laws more consistent with their rehabilitative purpose. June 1963 Federal Probation at 45.

19. See American Service Mut. Ins. Co. v. Bottum, 371 F.2d 6 (8 Cir. 1967).

20. Cf. Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960).

a dubious basis both in history and in logic." 388 F.2d at 100.

The Seventh Circuit recognized the fallacy of the contract argument and adopted the reasoning of Judge Celebrezze's dissent, pointing out that the parties do not enter the "contract" on an equal basis. Hahn v. Burke, supra, 430 F.2d at 104–105. See also Comment, "Rights Versus Results: Quo Vadis Due Process for Parolees," 1 Pac.L.J. 321, 338 (1970).

## ADMINISTRATIVE PROCEEDING

Parole revocation is an administrative, rather than a judicial, proceeding; therefore, according to the majority opinion, it is not necessary to conduct the revocation with regular procedures or provide notice to the parolee. The Michigan Court of Appeals has recognized that "the artificial designation of certain proceedings as 'administrative' will not withstand judicial scrutiny where the challenged tribunal has the power to incarcerate the accused." Warren v. Michigan Parole Board, supra, 179 N. W.2d at 669–670 n. 20. Professor Kenneth Culp Davis, one of the leading authorities on administrative law, also points out that an "administrative" classification does not negate the need for a hearing: "When adjudicative facts are in dispute, our legal tradition is that the party affected is entitled not only to rebut or explain the evidence against him but also to 'confront his accusers' and to cross-examine them." Davis, supra, § 7.05 at p. 426.

## HABEAS CORPUS ON ARBITRARY ABUSE

Although a prisoner is said to have no constitutional right to a hearing upon revocation of his parole, the majority opinion states that the parolee cannot be made the subject of "arbitrary" action. This is an attempt to ward off evil spirits by tossing a dart into the fog. It smacks of self-contradiction. This seems to be a recognition of the potentially dangerous consequences of explicitly denying any legal recourse to parolees whose paroles are revoked without procedural safeguards. However, this is merely a precatory warning, since the effect of the decision is to emasculate any effort to prevent the parolee from being made the subject of arbitrary action.[21] At oral argument the state conceded, with logical consistency, that there is an arbitrary right to revocation without explanation or rational basis. If it is true that there is no constitutional right to a hearing on parole revocation, the inevitable logical corollary must be that the state's power to revoke is absolute. The majority's ambivalent stand is even more confusing here when one considers that the present case deals with prisoners' claims under petitions seeking writs of habeas corpus. The petitioners are seeking a hearing to challenge an arbitrary revocation of parole. The majority opinion paradoxically denies this opportunity by deferring to the state's adjudication that parole revocation is a matter of absolute discretion and cannot be challenged.[22]

21. This is the same logical dilemma which Justice Brennan pointed out in his dissent to Cafeteria & Restaurant Workers Union Local 473, A.F.L.-C.I.O. v. McElroy, 367 U.S. 886, 901, 81 S.Ct. 1743, 1752, 6 L.Ed.2d 1230 (1961):
"In sum, the Court holds that petitioner has a right not to have her identification badge taken away for an 'arbitrary' reason, but no right to be told in detail what the reason is, or to defend her own innocence, in order to show, perhaps, that the true reason for deprivation was one forbidden by the Constitution. This is an internal contradiction to which I cannot subscribe."

22. The majority opinion refers to Curtis v. Bennett, 256 Iowa 1164, 131 N.W.2d 1 (1964), where the Iowa Supreme Court says that habeas corpus will lie where the parolee alleges that he is not the party intended, that the revocation is a forgery, or that the officials attempting to revoke are without authority. These matters deal with the state's *power* to act and do not meet the constitutional issues raised when authority is exercised in the manner provided by law. Also, these limitations are matters of mere expediency allowed by state law and do not attain constitutional proportions.

The argument that habeas corpus can later be available comes too late to effectively prevent unlawful punishment. Cf. Oestereich v. Selective Service System Local Bd., supra; Gutknecht v. United States, 396 U.S. 295, 90 S.Ct. 506, 24 L.Ed.2d 532 (1969). Such a remedy is illusory when applied to an arbitrary parole revocation. First the individual prisoner is taken summarily from private life and again regimented to one in a penitentiary. This is a drastic prerequisite to filing habeas corpus. Contrary to the spirit of the Great Writ, months or years may go by before a prisoner is given a hearing in a state court. State courts may well reason, as they have in the instant cases, that no hearing is ever necessary since the power of revocation is absolute. As in the instant cases, a hearing in the federal courts may be equally elusive. Clearly, habeas corpus fails to provide an adequate prophylaxsis where an individual's parole is wrongfully revoked. This is especially true where a simple explanation or presentation of facts might have demonstrated there was in fact no violation of parole.[23]

## COMITY

The majority emphasizes that federal courts should show judicial deference to state rights and not intervene in areas which traditionally have been matters of state concern. The majority opinion relies on the recent case of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). I have no disagreement with the proposition that the doctrine of "comity" should deter federal interference on constitutional issues

where the state has a *pending* opportunity to act. However, overlooked is that *Younger* and a companion case, Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971), recognize that if the state court misses the constitutional mark there can be federal review "by certiorari or appeal in this Court [the Supreme Court] or, in a proper case, on federal habeas corpus." 401 U.S. 82, 85, 91 S.Ct. 674, 676, 677 (1971). In the instant case the petitioners have exhausted their state remedies and *they are now here on habeas corpus.* All *Younger* and its companion case have set out to do is to require comity where a state court proceeding is already pending. *Younger, et al.,* did not mean we are to revert to 50 different applications of the Bill of Rights in deference to state's rights. *Younger* did not mean that a federal court must sit by and allow a state to misconstrue the Federal Constitution. This is far from the result reached by the Supreme Court in the recent decisions of Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); and Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). The Iowa parole revocation proceedings are either within or without the Fourteenth Amendment. Deference to state adjudication is not relevant here. Judicial deference to state interests cannot change the nature of an unconstitutional proceeding.

In the preface of his recent book Professor Davis observes:

"[T]he greatest and most frequent injustice occurs at the discretion end of the scale, where rules and principles provide little or no guidance,

23. Apropos is Mr. Justice Murphy's concurring statement in Estep v. United States, 327 U.S. 114, 131, 66 S.Ct. 423, 431, 90 L.Ed. 567 (1946):

"There is something basically wrong and unjust about a juridical system that sanctions the imprisonment of a man without ever according him the opportunity to claim that the charge made against him is illegal. I am not yet willing to conclude that we have such a system in this nation. Every

fiber of the Constitution and every legal principle of justice and fairness indicate otherwise. The reports are filled with decisions affirming the right to a fair and full hearing, the opportunity to present every possible defense to a criminal charge and the chance at some point to challenge an administrative order before punishment. Those rudimentary concepts are ingrained in our legal framework and stand ready for use whenever life or liberty is in peril."

where emotions of deciding officers may affect what they do, where political or other favoritism may influence decisions, and where the imperfections of human nature are ofter reflected in the choices made." Discretionary Justice, p. v (1969).

I think that wherever a state exercises arbitrary discretion to the detriment of individual liberty, the due process clause of the Fourteenth Amendment is still the applicable safeguard.

I would reverse and direct the district court to grant the writs of habeas corpus unless the state parole board grants an immediate hearing fully informing the the petitioners of the charges made back in 1969 and allow petitioners to present evidence relevant to the denial of the charges.